51 CCPA

**Torsten HASSELSTROM and Malcolm C. Henry, Appellants,**

v.

**Blaine C. McKUSICK, Appellee.**

**Patent Appeal No. 7032.**

United States Court of Customs and Patent Appeals.

Dec. 12, 1963.

T. Hayward Brown, H. L. Godfrey, Henry Van Arsdale, Washington, D. C. (Herbert Berl, Washington, D. C., of counsel) for appellants.

James H. Ryan, A. Newton Huff, Wilmington, Del., Frederick Schafer, Washington, D. C., for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

WORLEY, Chief Judge.

This appeal is from the decision of the Board of Patent Interferences, one member dissenting, awarding priority of invention in Interference No. 90,025 to McKusick, the senior party.[1] Hasselstrom and Henry, the junior party,[2] have appealed.

The subject matter is a process for irradiating ammonium acetate for conversion to and recovery of amino acids as defined by the single count:

1. A process for converting ammonium acetate into amino acids which comprises, irradiating ammonium acetate with ionizing radiation equivalent to at least about one million electron volts until a dosage of at least about $20 \times 10^6$ roentgen equivalent physical units have been absorbed, and subsequently recovering amino acids from the irradiated material.

■ McKusick took no testimony and is restricted to his filing date. Hasselstrom and Henry allege nine dates of actual reduction to practice, the earliest being January 3, 1956. Thus they took testimony to discharge their burden of proving priority by a preponderance of the evidence. The issue here is whether the board erred in finding that they failed in that respect.

The witnesses on behalf of Hasselstrom and Henry include the applicants themselves, and a Dr. Degering, all employees of the U. S. Army Quartermaster Research and Development Command; one David Francis, a technician employed by the High Voltage Engineering Corporation, and one Brown Murr, Jr., an army G.I. assigned to work with Hasselstrom and Henry.

The background of this matter is substantially as follows:

In 1954 the Quartermaster Corps of the U. S. Army was assigned to investigate the use of ionizing radiation for food preservation. In particular Hasselstrom, head of the Organic Chemistry Laboratory of the Pioneering Research Division of the Quartermaster Corps, was directed to investigate the chemical action of ionizing radiation on organic compounds. He began that project by arbitrarily choosing organic compounds and observing what happened when they were subjected to irradiation.

The general procedure developed by the laboratory for having organic compounds irradiated was to fill "Mylar" polyester film bags with solutions of the compounds to be irradiated, seal and label each bag with the name of the contents and the irradiation dosage to which the bags were to be subjected. Degering would pick up the bags at the laboratory in Natick, Mass., where the work was done, and take them to Cambridge, Mass., where they were irradiated under his direction by Francis. After the irradiating process, Degering would return the samples to Natick where they were analyzed by Henry or Murr.

Late in the fall of 1955, at a conference attended by Hasselstrom, Henry, Murr and one or two other assistants, the idea of irradiating ammonium acetate for the purpose of obtaining amino acids was discussed. Sometime before December 20, 1955, polyethylene bags of aqueous ammonium acetate were prepared for irradiating in accordance with the established procedure at the laboratory. On December 20, 1955, Murr left on Christmas leave. When he returned on January 5, 1956, Henry showed Murr a page in Henry's personal notebook which contained a small sample of the amino acid glycine, purportedly obtained from an irradiated sample of ammonium acetate. Identification of the glycine was performed by Henry during Murr's absence.[3] On February 2, 1956, Henry determined the approximate quantities

---

1. McKusick is involved on the basis of his application, Serial No. 658,962, filed May 14, 1957.

2. Hasselstrom and Henry are involved on the basis of their application, Serial No. 689,454, filed October 10, 1957.

3. That the deposit in the notebook was in fact glycine is not disputed.

of amino acid obtained from irradiation of ammonium acetate. Thereafter, during March and April of 1956, Murr adapted an analytical procedure which was described in the literature [4] for the quantitative determination of amino acid. Between May 1 and July 20, 1956, Murr performed quantitative analyses of solutions of ammonium acetate taken from "Mylar" bags which had been marked for irradiation in accordance with the procedure at the laboratory. On July 20, 1956, Murr was separated from his command and left the laboratory permanently. The results he had obtained from his analyses of the ammonium acetate solutions to determine the amount of amino acid present were tabulated and incorporated as a "Table" in an article printed in "Science" on February 22, 1957.[5] On May 14, 1957, McKusick filed his application. Hasselstrom and Henry filed October 10, 1957. This interference was declared February 3, 1959.

The members of the board carefully analyzed the evidence but disagreed in their evaluation of that evidence. The majority noted seemingly conflicting testimony between Henry and Murr as to who gave the samples to Degering for irradiation, stating:

"* * * Significantly, Henry testified that it was he who bagged the samples for irradiation and gave no testimony regarding Murr's help. Also pertinent to this issue is the total absence of testimony by Murr regarding to whom he gave the samples he prepared, to Henry or to Degering. Presumably, in view of Henry's testimony, it was Henry who gave the samples which he and Murr prepared to Degering.

\* \* \* \* \* \*

"* * * it is a fair inference from the record that it was Henry who gave to Degering the samples that he and Murr prepared.

4. A. L. Levy, Nature 174, 126 (1954).

5. Hasselstrom, Henry, and Murr, "Synthesis of Amino Acids by Beta Radiation."

The statements by Henry to which the board referred are:

"Q. 37 How did Dr. Degering get this bag containing this ammonium acetate to irradiate?

"A. I would fill up the bags with the solutions of materials that I wanted to have irradiated. I would seal the bags myself, label them, put them in aluminum containers separated by cardboard and hand them to him in a single unit in this metal tray. Then when he got to the place in Cambridge, he would take each bag out, look on the bag to see what the dosage was and pass it under the accelerator beam."

In evaluating that testimony we note that the questions immediately preceding Q. 37 had directed Henry's attention to that page of his notebook containing the glycine sample, which page bears the date January 3, 1956. A further indication that the answer to Q. 37 is based on activities connected with that date lies in Henry's response to the next three questions:

"Q. 38. And this solution was in one of these bags you gave him? [Referring to Degering.]

"A. That's right. On several occasions I went with him and irradiated my own samples.

"Q. 39 Do you remember when you gave him that bag?

"A. No, I am not sure when this one you are referring to on January 3rd—

"Q. 40 Yes.

"A. I don't know when he radiated [sic] that. It must have been on the date, whatever previous date that he went to Cambridge previous to 3 January."

On cross examination Henry testified:

"XQ. 15 You ran blanks. Did Mr. Murr have anything to do with

SCIENCE, Vol. 125, No. 3243, pages 350–1, (1957).

recovering amino acids from this irradiated material?

"A. Yes, yes, he worked up the recovery of these, *later on he prepared the solutions, had them irradiated and worked up practically the whole procedure.*" (Emphasis added)

On cross examination Degering testified:

"XQ. 10 Did you ever do any irradiation for Mr. Murr?

"A. Well, that—that I can't answer exactly. That is, I irradiated samples that Mr. Murr prepared or helped prepare but I assumed they were being done for Dr. Henry and Dr. Hasselstrom. That is, I didn't identify them as Mr. Murr's samples. *I irradiated samples that he brought to me that were prepared by him,* but I identified them as Dr. Henry's or Dr. Hasselstrom's samples." (Emphasis added)

Murr, on direct examination testified:

"29Q. Mr. Murr, subsequent to January 3, or January 4, 1956—in other words, when you returned from your vacation leave—what were your activities if any with regard to the recovery of amino acids from ammonium acetate by irradiation?

"A. After I returned from leave, I still was doing some work connected with the irradiation of sodium acetate. Dr. Hasselstrom had asked me to complete this as soon as possible, so that I could begin work on the isolation, identification, of the amino acids obtained from the irradiation of ammonium acetate. Now, we prepared, in this time, after January, I couldn't say exactly what date, but I—Dr. Henry and I prepared solutions of various concentrations of ammonium acetate in water, sealed the solutions in polyethylene bags, and turned them over to Dr. Degering to be irradiated.

The standard procedure was, Dr. Degering would bring the bags back to the lab and we would analyze the solutions. The description of the experiment on page 90 is the way that I actually processed solutions from—that were irradiated."

It seems to us that when Henry's seemingly conflicting testimony is viewed in the context of the surrounding circumstances it is reasonable to conclude that Henry's attention was focused on *his work* in connection with *his discovery* of the conversion of ammonium acetate into an amino acid while Murr was absent. In our view both Henry and Degering recognized that after Murr's return to the laboratory in January he, Murr, prepared solutions and "had them irradiated" i. e. took them to Degering.

The majority found that the evidence fails to establish an actual reduction to practice at any point of time with the definiteness required on such a vital matter in interference proceedings. They stated:

"The subject issue can be summarized by stating that Murr has never, on this record, pointed to a particular sample of ammonium acetate which he bagged for irradiation, which he gave to Degering and which was directly returned to him after irradiation, and which he analyzed for amino acids. The Thurston, Reed and Searle cases, supra.[6] In particular see Senkus v. Johnston, 166 F.2d 597, 35 CCPA 1008, 611 O.G. 759. There the court said:

"Appellant contends here that the board erred in its action 'relating to the necessity for visual observation by a corroborating witness of a process conducted by an inventor, holding in effect that such a witness must testify that he observed on a specific date at least one specific experiment from start to finish with each process

6. The cases referred to are Thurston v. Wulff et al., 164 F.2d 612, 35 CCPA 794; Reed v. Cislak et al., 175 F.2d 972, 36 CCPA 1117; Searle v. Glarum et al., 179 F.2d 974, 37 CCPA 896.

step conducted in consecutive order and with the ultimate preparation of a white crystalline product.' It is indeed difficult to understand such contention. In order that a corroborating witness be properly equipped to give testimony in a case such as this, he surely must see the operation of the process and have personal knowledge of the product. We can see no error in the holding complained of."

The dissenting member agreed with the majority "both as to the statement of facts in this case and as to the validity of the principles of law which they discuss, when appropriately applied." He further stated:

\* \* \* I have gone through the testimony with great care and have, like my colleagues been unable to find a record of a single sample on which a perfect case history was established by the corroborating witness Murr, from the initial preparation of the identified material to be irradiated, through the step of irradiation and return, the separation of an amino acid fraction, and the final analysis to ascertain the amounts of the respective amino acids in the irradiated product. *The record clearly shows, however, corroboration of an established routine for performing all of these steps but the final step of analysis, and it shows that the corroborating witness Murr personally performed these steps* \* \* \* *with some materials and collaborated with Henry in their performance in other instances. There can be no possible doubt that the process of the count was practiced not just once but many times, and that Murr was personally familiar with every step to which he testified."* (Emphasis added)

It seems to us that when the evidence is viewed as a whole it sufficiently corroborates the performance of each step of the count and thus supports the position of the dissenting member.

Murr corroborated the preparation of ammonium acetate samples. That he knew those samples were being prepared for the purpose of converting ammonium acetate into amino acids is obvious from the fact that he worked side by side with Henry, sharing a common notebook, and was intimately connected with the work done at the laboratory. Murr did not merely *observe* the events at the laboratory, he *participated* in them and was, at least in part, responsible for them. It is clear that Murr had personal knowledge of the events at the laboratory testified to by Henry. Degering and Francis testified from personal knowledge of the irradiation steps of the count, including the radiation dosage to which the bags were subjected. Degering confirmed that he received samples from Murr although he attributed them to Henry. Degering testified to the actual irradiation of the samples at Cambridge. The dosage to which the samples were exposed was corroborated by Francis, the technician at Cambridge, and Degering. Henry and Murr knew of the apparatus used and the procedure employed by Degering as the result of their both having visited the irradiation site at Cambridge. Murr had worked for Degering at Cambridge for about a month before going to the laboratory at Natick.

Murr testified that he recovered amino acids from irradiated samples of ammonium acetate many times and identified seven runs occurring between May 1 and July 11, 1956. The data obtained from those runs formed the basis for a Table published in the "Science" article referred to above.

■ McKusick argues that the "Science" article is inadmissible as being hearsay. While the article cannot be regarded as proving the truth of the contents thereof, it is admissible to show that Hasselstrom and Henry made the statements therein. The mere fact that those statements, which conform substantially to their testimony, were made before any priority controversy arose,

in fact before McKusick filed his application, supports the credibility of that testimony.

McKusick also argues that Murr could not corroborate the irradiation steps of the count. While that may be true, we see no necessity for the same witness to corroborate every step of the count. Together, Murr, Degering and Francis corroborated every step of the count.

We have not overlooked the fact that the testimony does not cover the passage of a *specific sample* of ammonium acetate through all the steps of the process. However, the instant record satisfactorily establishes a system or pattern whereby, over a period of approximately six months, *many samples* were prepared, irradiated, and analyzed, and amino acids isolated therefrom.

The board found that Degering returned the irradiated bags to Henry who then gave them to Murr, and therefore Henry's intervention breaks the chain of corroboration. However, in our opinion the basic question is not so much to whom Degering returned the irradiated bags, but whether the evidence establishes that the solutions of ammonium acetate which Murr analyzed were the same solutions which Degering irradiated. We think the evidence fairly supports the conclusion that the irradiated solutions and the analyzed solutions were the same.

Senkus v. Johnston, relied on by McKusick and the board, is distinguishable from the present case. There two witnesses were relied on to corroborate reduction to practice. One witness observed the weighing into a reaction flask of one of the reactants used and noticed "the pungent odor or formaldehyde when the reaction mixture was distilled." He also testified that at some later time he saw a product which he understood to be prepared from that reaction. The other corroborating witness in that case testified to carrying out a particular reaction at the inventor's suggestion. However, there was "no evidence that the product resulting from the reaction mixture * * * was analyzed, and thus nothing to show that the product of the count was produced. It is apparent that those witnesses did not either individually or together, corroborate the facts necessary to a reduction to practice. Here, on the contrary, the cumulative testimony of the witnesses corroborates performance of every step of the count.

The board relies on three cases in addition to Senkus v. Johnston as establishing that independent corroboration of an inventor's testimony is essential to establish an actual reduction to practice, namely, Thurston v. Wulff et al., Reed v. Cislak et al., and Searle v. Glarum et al. Considering that a party in an interference proceeding is rarely in a position to present evidence contradicting his opponent's testimony as to his acts of invention, we are in complete agreement with the necessity for corroboration of an inventor's testimony. However, the purpose of corroborative evidence is to confirm and to strengthen the testimony of the inventor.[7] Obviously the amount and quality of corroborative evidence that is necessary in any given case will vary with the facts of that case. As we observed in Phillips and Paul S. Starcher v. Carlson, 278 F.2d 732, 47 CCPA 1007 there can be no fixed single formula in determining the sufficiency of corroborative evidence. The facts of the present case established by the testimony of Murr, Degering and Francis, including particularly the strong evidence of a routine involving the practice of the steps of the count, satisfy us that the process in issue was reduced to practice on or before July 20, 1956, the date Murr left the Quartermaster command.

7. Revise and Caesar "Interference Law and Practice," Vol. 3, p. 2127 (1947).
"Corroborative evidence" is generally defined as additional evidence of a different character tending to prove the same point or fact. In other words, it is evidence tending to confirm and to strengthen or to show the truth or probability of truth of a witness' testimony.

Hasselstrom and Henry having proved actual reduction to practice by a preponderance of the evidence prior to McKusick's filing date, we are obliged to *reverse* the decision of the board.

Reversed.