56 CCPA

**Allan Robert Andrew BEEBER and Daniel S. Spechler, Appellants,**

v.

**Lester C. KROGH and Richard E. Brink, Appellees.**

**Patent Appeal No. 8005.**

United States Court of Customs and Patent Appeals.

Nov. 21, 1968.

Rehearing Denied March 6, 1969.

J. Russell Juten, Hoboken, N. J. (Peter F. Willig, Lionel N. White, Hoboken, N. J., Hobart N. Durham, John C. Vassil, Roger T. McLean, New York City, of counsel), for appellants.

Stanley G. DeLaHunt, Richard E. Brink, Kinney, Alexander, Sell, Steldt & DeLaHunt, St. Paul, Minn., for appellees.

Before WORLEY, Chief Judge, and RICH, SMITH, ALMOND, and BALDWIN, Judges.

BALDWIN, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority to Krogh and Brink in Interference No. 92,283, into which Interference No. 92,284 has been consolidated.[1] The three counts in issue correspond to claims 5, 1 and 2, respectively, of U. S. Patent No. 2,893,896, granted to Beeber and Spechler on July 7, 1959 on application Serial No. 656,513, filed May 2, 1957. The appellees, Krogh and Brink, are involved on the basis of claims constituting modifications of the aforementioned patent claims which they copied in their application Serial No. 552,684, filed November 7, 1955.[2]

The parties in interest are Keuffel & Esser Co., assignee of Beeber and Spechler, and Minnesota Mining and Manufacturing Co., assignee of Krogh and Brink.

The invention relates to a method of treating an oriented polyethylene terephthalate film with a halogenated fatty acid to render the film receptive to a coating of an organic material. Polyethylene terephthalate is also referred to throughout the record by the term "Mylar," identified as a trademark of the DuPont Company.

---

1. The consolidation followed the elimination of a third party originally in Interference No. 92,283.

2. As noted, the interferences were declared with the patent claims as the counts and with the competing claims of Krogh and Brink designated as modifications of the counts. The latter claims are broader than the corresponding patent claims due to omission of, and substitution for, certain recitations. It thus appears that the practice followed here is at variance with the instructions in the Manual of Patent Examining Procedure, Third Ed., Section 1101.02, which states that "[w]here a patent claim must be modified, the count of the interference should be the broader claim as between the patentee and the applicant." However, this apparent departure from the established practice does not affect our determination here in view of the particular basis on which we find the appeal must be decided.

Counts 1 and 2 are representative:

1. The method of pre-treating a high molecular weight oriented polyethylene terephthalate film to make it receptive to coatings of organic materials comprising the steps of coating said film with a solution of trichloracetic acid in an inert organic solvent compatible therewith which wets the surface of said polyethylene terephthalate film, the concentration of the trichloracetic acid in said solution being selected at an effective concentration which will not produce visible etching of said polyethylene terephthalate film under the particular process conditions employed, and heating said coated film to a temperature in the range from 100° F. to 300° F. to remove said organic solvent, react said trichloracetic acid with the surface of said polyethylene terephthalate film and remove the excess trichloracetic acid.

2. The method of pre-treating a high molecular weight oriented polyethylene terephthalate film to make it receptive to coatings of organic materials comprising the steps of coating said film with a solution of an halogenated fatty acid in an inert organic solvent compatible therewith which wets the surface of said polyethylene terephthalate film, the concentration of said halogenated fatty acid in said solution being in the range from 0.2% to a completely saturated solution.

█ Appellees, Krogh and Brink, took no testimony and thus are restricted to their November 7, 1955 filing date for conception and constructive reduction to practice. As junior party, Beeber and Spechler introduced evidence directed to proving conception and reduction to practice prior to that date. Their evidence includes testimony of the co-inventor Spechler, a research supervisor in the chemical laboratory of Keuffel & Esser, and other employees of that company, along with a number of exhibits.

In awarding priority to appellees, the board held that Beeber and Spechler have failed to prove actual reduction to practice prior to appellees' filing date. Although Beeber and Spechler raise other issues also, we find the matter of whether they have proved reduction to practice to be controlling. Therefore, we will confine our opinion to that issue.

The basis for the holding in question was that the evidence does not include sufficient corroboration of reduction to practice. The board stated:

Spechler's testimony and the evidence of page 149 of his notebook is to the effect that the process was carried out and that the process rendered the Mylar film receptive to coatings of organic materials; but question of corroboration arises. * * *

It ruled that the corroboration was inadequate after discussing in particular what it deemed the shortcomings of the testimony of Kosar and Kastner, two research chemists associated with Spechler. The board also referred to testimony of other witnesses including Kappler, manager of a Keuffel & Esser department manufacturing products including drafting materials known as Stabilene products, and Ritchie and Eck, both of whom were employed in Kappler's department in connection with the application of coatings in the production of such materials. Also testifying were Stein, who was employed in the laboratory from 1953 to about 1956, Burke, a draftsman, and Rampulla, a purchasing clerk.

As background, by 1953 or 1954 Keuffel & Esser had developed drafting materials [3] under the name of "Stabilene" products, which materials included a coating of a drafting surface on a polyethylene terephthalate base. Beeber and Spechler filed, on March 24, 1955, a patent application disclosing such a product in the form of a polyethylene terephthalate or "Mylar" base provided with an

---

3. One use for the materials was as a replacement for conventional tracing paper and cloth.

overcoat of a film forming resinous material.[4]

The adhesion between the base film and its resin coating was not at all times as firm as required, and steps were taken to solve that problem. Those steps included tests directed to applying a precoating to the film in the form of halogenated aliphatic or fatty acids, and the practice of using trichloroacetic[5] acid in solution in toluene for pretreatment was eventually adopted.

Spechler, a coatings chemist in the laboratory at the time involved, in late 1954 and early 1955, testified concerning original work done by him with the aid of his assistant, Kastner, to determine the effect on adhesion of coatings obtained by use of various pretreatments on the polyethylene terephthalate film. He stated that the work started using trichloroacetic acid in water solutions but such solutions did not give very good results, and he and Kastner decided to use organic solutions, with best results being obtained with a solution of approximately 5% trichloroacetic acid in toluene. The decision that toluene was a desirable solvent for use in the process was made prior to March of 1955. Spechler further stated that in the early laboratory tests, the film was dried in a small laboratory oven after the solution was applied and that it was determined that "an elevated temperature about above 100 Fahrenheit up to about 300 Fahrenheit" appeared to give them good results. It was also testified by Spechler that they "made a run on a production size machine" in March of 1955.

Spechler produced certain pages of his laboratory notebook (Exhibit 2) in support of his testimony regarding the tests. Of particular interest is page 149 of that notebook. The subject matter handwritten on that page is set out below:

Trichloroacetic acid treatment of Mylar

3–7–55

| 1) | 4½ gal | 3 gal Toluol – (22 lbs. Approx) | 14.5 |
| | 1.45 lbs. | 1.1 lb. Trichloroacetic | .74 |

Dip coated in # 9 machine at 80 yds/hr coverage 150 yds per gallon – RMC $0.80/gal T – 175 at top of machine. – $ .0053 per yd

Try        Plexigum J – 16 – Rohm & Haas
               "        MB  319
          Epikote 1004 + DBP — Shell

2) Pencil surface BCV over 1 on Mylar

3) Regular pencil over untreated Mylar

4) Pencil BCV over 1 on Swedlow plastic cloth

Notes – adherence of (2) excellent, cannot be removed by "Scotch" tape or crumpling.

Adherence of (3) fair – not easily removed by tape over most areas but some spots tend to have spotty adherence   No noticeable difference on Swedlow cloth.

———◆———

The gist of Spechler's testimony regarding page 149 is that the first part thereof was initially made for a proposed experiment to be carried out on a dip

---

4. U.S. Patent No. 2,999,016 was granted on that application on September 5, 1961.

5. Alternately spelled "trichloracetic," as in count 1.

coating machine and that the complete entry in its final form, as reproduced above, represents the conditions and results of experiments actually carried out in furtherance of the proposal on the date of "3–7–55" or March 7, 1955 set out thereon or "a few days later." The figures in certain of the data, such as "#9 machine" and "80 yds/hr," represent changes from the proposal to correspond to the actual conditions of the experiments performed. Spechler identified "T–175" on the page as referring to the drying temperature, on the Fahrenheit scale, in the No. 9 machine at the time. He further identified items 2 and 3 on the page as representing tests of materials with coatings applied to trichloroacetic acid treated film and untreated film, respectively, with the results at the bottom of the page showing "excellent" adhesion as demonstrated by "Scotch" tape and "crumpling" tests for item 2 and only fair adhesion for 3. In his testimony, Spechler stated that "crumpling of the sheet [in 2] did not result in any flaking or loss of coating adhesion" and explained the "Scotch" tape test as follows:

> This was a common test used in coating evaluation, it consists of the application of a general cellulose base adhesive tape to the film, rubbing it down well, and removing it with a snap to try to remove the coating. It gives some evaluation of adhesion of coatings.

Spechler also testified that he described the subject matter of the invention to others. He specifically referred to Kosar, who "was interested in a related field," to his own assistant Kastner, and to Kappler and Ritchie, who were involved with the machine used in the experiments he recounted. Typewritten reports, giving specifications for trichloroacetic acid treatment of "Mylar" were identified by Spechler. Exhibit No. 3, dated August 4, 1955, was signed by Spechler and initialed by Beeber. Exhibit No. 4, dated June 12, 1956 and thus too late to be of direct interest here, was signed by Spechler and sets forth substantially the same data as Spechler's notebook page 149, to which it makes reference.

The preceding summarizes the evidence of Spechler which the board found, in the portion of its opinion previously quoted, to be "to the effect that the process was carried out and that the process rendered the Mylar film receptive to coatings of organic materials." While that evidence in our judgment obviously is to the effect stated by the board,[6] it is of course true that testimony of an inventor is not by itself effective to prove reduction to practice in the absence of corroboration. Collins v. Olsen, 26 CCPA 1017, 102 F.2d 828 (1939), the only authority cited by the board on the present point, relates to a case in which corroborating testimony was found inadequate. However, the facts there are so clearly distinguished from the present situation as to render it of scant assistance here.

Of greater significance in the present case are certain more recent decisions of this court which have benefited from a larger number of prior decisions to draw from and thus are able to present a more complete and more timely analysis of the law regarding adequacy of corroboration. Those recent decisions direct us to review all of the evidence and consider it as a whole in determining whether the testimony of an inventor is corroborated. Applying such a standard to the present case convinces us that Beeber and Spechler have demonstrated by legally sufficient proof that the invention in issue was conceived and reduced to practice well before appellees' filing date of November 7, 1955.

A decision particularly in point is Mann v. Werner, 52 CCPA 1578, 347 F.2d 636 (1965). There the court stated:

> This court has rejected the notion that each individual act in the reduc-

---

6. The board found "the Scotch tape test, if not the crumpling test" to be adequate to demonstrate the practice of the process to be successful. It does not appear that appellees contend to the contrary before us.

tion to practice of a count must be proved in details by an unbroken chain of corroboration. See Patterson v. Hauck, 341 F.2d 131, 52 CCPA 987; Gianladis v. Kass, 324 F.2d 322, 51 CCPA 753; Hasselstrom v. McKusick, 324 F.2d 1013, 51 CCPA 1008. As we said in the latter case, "the purpose of corroborative evidence is to confirm and to strengthen the testimony of the inventor." The proper approach, we believe, involves a reasoned examination, analysis and evaluation of all the pertinent evidence bearing on the question, to the end that a reasoned determination as to the credibility of the inventor's story may be reached. * *

Patterson v. Hauck (1965), cited in the above quotation, analyzes the other two cases cited therein as well as additional leading cases of both early and recent vintage. It plainly shows the criterion we apply of reviewing all of the evidence and considering it as a whole.

The *Patterson* case itself is particularly helpful in the application of the proper standard to the evidence here. Noting that the invention there related to a simple process, as is plainly true of the present invention also, the court found corroborative significance in such factors as independent proof that the involved materials had been known and used in the assignees' operations and that the inventor had been assigned to work out a better process for using such materials.

Returning to the evidence here, testimony and supporting documents of Kappler and Stein show that they participated along with Beeber and Spechler, in a conference on December 15, 1954, involving a Stabilene product made up of a polyethylene terephthalate or "Mylar" base film coated with a drafting surface. Pretreatment of the "Mylar" base with trichloroacetic acid to improve adhesion of the coating was considered there, although the evidence does not establish that Beeber and Spechler had conceived the subject matter defined by the counts by that date.

Kastner, who began work for Keuffel & Esser as Spechler's assistant on February 1, 1955, testified that shortly thereafter he and Spechler worked on trichloroacetic acid treatment of "Mylar" film. He stated that they made up laboratory bench solutions, tried them on the film, "tried various coatings" they had made, lacquers that they had "established," and checked them for improvement in adhesion. Kastner also stated that they "settled on" a formulation for the treating solution at that time and ran "a series of tests and evaluations on various coatings." He further referred to Spechler's notebook as "the only notebook at that time in our lab," stated that it was available for reference work during working hours and that he used it, as when he "needed it to make up a machine batch or, say, 5 gallons for a testing solution." According to Kastner, the formulation set out on page 149 of the notebook which includes toluene as the solvent, was the standard one used for making up trichloroacetic acid solution for the initial tests.

Concerning machine tests, Kastner stated that the pilot coating on the machine was usually done by production people, supervised by laboratory personnel including Spechler and himself. He described the No. 9 dip coating machine used therefore as completely immersing the film in the acid solution and including radiant heaters for drying the material as it emerged. According to Kastner, the temperature was a maximum of 200 degrees in the upper part of the machine and about 130 degrees at the bottom, with the purpose of the heat being "to drive off the excess toluene and eliminate any residual amounts of acid that were left on the sheet."

Kastner testified that treated film was tested for adhesion, stating:

> It would be dipped into a lacquer which was currently being used on some testing, a frost lacquer, which we called it, with a resin base. We would dip it in, bake it in an oven for a specific period of time, to cure it, and we would check it with "Scotch" tape, or wrinkle it, fold it, and check the adhesion of the coating along the seam of the fold.

He then described the "Scotch" tape test the same as it was described by Spechler. The witness also stated that the film was transparent after the trichloroacetic acid treatment and that the treatment caused "[n]o apparent etching."

Ritchie stated that he had the responsibility of setting up work for the coaters in 1955 and testified, with the aid of contemporaneous records, concerning numerous instances of treating "Mylar" film with trichloroacetic acid during the period in that year prior to appellees' filing date. The acid treatment was described as accomplished on the No. 9 machine, referred to on Spechler's notebook, page 149, and the drying temperature was specified as about 185 degrees with the speed of 80 yards per hour for the film through the machine being established the "first part of April, 1955." Spechler and Kastner were designated as having done some of the coating or treating themselves and as having made tests on treated films after coatings were applied to them.

Ritchie testified that the film that was treated came from rolls with labels having "DuPont Mylar" on them and insisted, despite vigorous questioning by counsel for appellees, that such identification was correct. While the solutions of trichloroacetic acid used were prepared by others, Ritchie testified to the trichloroacetic acid having arrived at the shop in cartons identifying it as that product from Dow Chemical Company.[7]

The witness Eck, a coater in the same department as Ritchie, also testified to the treating of "Mylar" film with trichloroacetic acid solution on the No. 9 machine during early 1955.

Turning to Kosar, he testified that his first assignment, after commencing employment with Keuffel & Esser on January 31, 1955, was to find a way to adhere photographic emulsion to polyester cloth. He requested suggestions on that problem from Spechler and his description of the latter's response to the request is set out in the following testimony:

Q34. Tell us what you can remember of what he told you.

\* \* \* \* \* \*

A. Well, he told me that he has a similar problem, only that instead of polyester cloth he was using polyester film, and he told me about his experiments with trichloroacetic acid, which he dissolved in solvents, about some other chlorinated or halogenated acids, trichloro, and he just showed me, he had on his bench. Now, I really cannot recall now that he showed me the exact experiment what he did and he proved to me, but I would not be satisfied with less than what does he show me, so I recall this very clearly, that his lacquer stick very well to the Mylar, so I obtained the formula from him and I tried the same thing on the polyester cloth.

Q35. I am not completely clear in my own understanding of your answer, Doctor, as to whether you recall his performing the experiment or whether you do not recall his performing the experiment. A. Well, I do not recall the exact way how he showed this experiment to me, but I am sure that on some way he had to satisfy me that this method works.

Kosar testified also that Spechler used a "Scotch" tape test to demonstrate that the adhesion of the lacquer to the Mylar was good. Testimony and records of Kosar demonstrate that he carried out similar trichloroacetic acid treatment and adhesion tests on polyester cloth in February of 1955.

The board dismissed Kastner's testimony as "very general" and stated that it "does not establish any specific instance of carrying out the process defined in the counts and the satisfactory testing of the coated material in that instance."

---

**7.** Kappler testified that "Mylar" was purchased from DuPont Company in the early stages of the work treating such film. He also stated that trichloroacetic acid was purchased from Dow Chemical.

However, we consider it apparent from our review of Kastner's testimony that it has very significant corroborative value. It substantiates that Spechler and Kastner worked on the problems of pretreatment of "Mylar" film and that the problem was solved by the treatment testified to by Spechler. The fact that specific conditions required by the counts prevailed during the experimental work is supported by Kastner, and he confirms that pertinent activities took place well before the earliest date to which appellees are entitled. Kastner's testimony plainly serves the purpose of corroborative evidence, in the language of Hasselstrom v. McKusick, supra, "to confirm and strengthen the testimony of the inventor." The answer to the objection that a "specific instance" of carrying out the invention and satisfactorily testing the invention is not established by Kastner's testimony is also indicated in that case where it is stated in finding corroborated reduction to practice:

> We have not overlooked the fact that the testimony does not cover the passage of a *specific sample* of ammonium acetate through all the steps of the process. However, the instant record satisfactorily establishes a system or pattern whereby, over a period of approximately six months, *many samples* were prepared, irradiated, and analyzed, and animo acids isolated therefrom.

It is our judgment that the record here establishes not only that the particular work described in connection with page 149 of Spechler's notebook took place within the time in question, but that there were also other instances in which "Mylar" film was treated as required by the counts and provided with coatings which showed satisfactory adhesion on testing during the early part of 1955 and before appellees' effective date.

That conclusion is further reinforced by the testimony of Kappler, Stein, Ritchie and Eck. Thus, Kappler and Stein provide corroboration that the problem of adhesion of coatings to "Mylar" film was recognized by several persons at Keuffel & Esser, including both Beeber and Spechler, at the time of the activities relied on here. Ritchie and Eck substantiate the testimony of both Spechler and Kastner regarding their practice of the treatment and testing of coated material embodying the treatment. In particular, Ritchie provides significant corroboration of the operations on machine No. 9 taking place within the critical period and further corroborates the evidence as to many specific aspects of the process.

Concerning Kosar's testimony, the board stated:

> The record * * * shows that Kosar testified that Spechler took a strip of transparent film, dipped it in a solution, then dried it, coated it with something else, dried it and checked the adhesion. Kosar agreed that that was the substance of what he could recall of that experiment.

The deficiency it finds in that testimony is that Kosar did not have independent knowledge that the materials used in Spechler's demonstration to him were what Spechler said they were. We need not determine whether Kosar's testimony alone constitutes adequate corroboration. The testimony plainly recounts circumstances which tend to confirm and strengthen the testimony given by Spechler, and, taken with the evidence of the other witnesses, it satisfies us that Spechler's account of the activities is true.

Appellees argue in their brief that:

> * * * no entry is found in the notebook in the specificity of the counts, which, as shown above, Spechler, himself, considered necessary to the complete practice of the invention. * * *

The "as shown above" apparently is based essentially on testimony of Spechler concerning a portion of the Beeber and Spechler specification. The portion of the specification reads:

> According to the present invention, the polyethylene terephthalate film is coated with a solution of a halogenated

fatty acid in an organic solvent and then the coated film is heated to a temperature in the range from 100° F. to 300° F. to remove the organic solvent, to react the halogenated fatty acid with the surface of the polyethylene terephthalate film, and to remove the excess halogenated fatty acid by evaporating it from the surface.

The testimony includes the following question which Spechler answered affirmatively:

Can we agree, then, that in order to achieve a surface on the polyethylene terephthalate film which is receptive to a firm bond between it and an overlying organic coating, that there is more to the process than just dumping on a solution of halogenated fatty acid; namely, you have to do these other things that are referred to in this sentence; is that correct?

Appellees further urge that the board expressly considered page 149 and found it inadequate.

We do not find those arguments persuasive. Spechler not only identified his notebook but testified regarding it and the activities it covered. It would be futile to consider either the notebook alone or the testimony alone. Considering the notebook and the testimony together, the board did not find any feature of the count lacking. It only concluded that adequate corroboration has not been provided. On that point, we consider the board to be in error for the reasons already stated.

Appellees further rely on Thurston v. Wulff, 35 CCPA 794, 164 F.2d 612 (1947) and Vandenberg v. Reynolds, 46 CCPA 938, 268 F.2d 744 (1959) as supporting their position that there is not adequate corroboration of reduction to practice. In Patterson v. Hauck, we pointed out how the board there drew unduly rigid principles of law from Thurston v. Wulff, and we think appellees have fallen into the same error here. In the present case, as in *Patterson,* the question is whether a simple process using known materials was practiced and does not involve the complexity of establishing the identity of a chemical compound as was the case in *Thurston.* The principles set out in *Patterson* thus govern here.

As to the *Vandenberg* case, appellees do not point out any specific analogy in the factual situations but instead rely on a statement made therein as follows:

We cannot, however, accept mere probability or likelihood as proof of an actual reduction to practice.

We see no reason to disagree with that pronouncement in the context of that case. However, the burden on Beeber and Spechler here is to prove priority by a preponderance of the evidence. They need not prove their case beyond a reasonable doubt. Since we think they have met their proper burden so far as proving the facts asserted by Spechler is concerned, the issue must be decided in their favor.

Two other contentions of appellees remain for consideration. One of them is that the actions of Beeber and Spechler and their assignee, after the activities relied on, are inconsistent with an actual reduction to practice having taken place as asserted. We find nothing in the record to give any substantial support to that contention. The fact, advanced by appellees, that the application for the earlier Beeber and Spechler patent for the coated "Mylar" product lacking acid pretreatment was filed on March 24, 1955 without disclosing the invention presently involved, is plainly of no significance. The earlier patent relates to a product which Keuffel & Esser apparently had already developed and was either marketing or about to market. On the other hand, the patent here involved relates to an improvement process which the assignee might well be expected to patent separately and which, at the time, was not subject to any urgency because of public use.

Appellees next urge that "the complete absence of contribution by the coparty Beeber to the subject matter" is perhaps

"one of the most significant indications of lack of success at K & E in 1955." They contend that there is an inference that Beeber [8] made his contribution after the period in early 1955 covered by the evidence. Such contention is entirely too remote to be given any weight and plainly cannot overcome the substantial evidence of actual reduction to practice already discussed. Moreover, it is clear that a question of third party inventorship cannot be raised in these proceedings. Huang v. Cheney, 53 CCPA 1355, 362 F.2d 816.

In summary, we are convinced that Beeber and Spechler have demonstrated by legally sufficient proof that the process in issue was successfully performed in the early part of 1955 and well before the filing date of appellees. Hence the board erred in not awarding priority to Beeber and Spechler.

The decision of the board is reversed.

Reversed.

Judge SMITH participated in the hearing of this case but died before a decision was reached.

---

8. The record estabishes that Beeber, who was in charge of the laboratory group during the period in question, left Keuffel & Esser subsequent to May of 1957 and indicated in 1960 that no further cooperation by him with the company could be expected.