58 CCPA

**Arthur William ANDERSON and William Lawrence Truett, Appellants,**

v.

**Gustav PIEPER, Hans Rickert and Eberhard Stein, Appellees.**

**Patent Appeal No. 8476.**

United States Court of Customs and Patent Appeals.

May 27, 1971.

Rehearing Denied July 15, 1971.

Herbert W. Larson, Wilmington, Del., attorney of record, for appellants; A. Newton Huff, Wilmington, Del., James T. Corle, Arlington, Va., of counsel.

Burgess, Dinklage & Sprung, New York City, for appellees; Arnold Sprung, New York City, of counsel.

Before RICH, ALMOND, BALDWIN, and LANE, Judges, and SKELTON, Judge, United States Court of Claims, sitting by designation.

LANE, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority to appellees (hereafter Pieper) on the following count:

1. A process for the production of a solid polyethylene which comprises (1) reducing titanium tetrachloride with aluminum and (2) contacting ethylene with a catalyst consisting of the product of step (1).

Appellants (hereafter Anderson) were in a position junior to Pieper, Anderson's application serial No. 584,887, filed May 15, 1956, being entitled to the benefit of earlier applications serial Nos.

450,243 and 450,244, both filed August 16, 1954. Pieper was accorded a convention priority date of June 9, 1954. A third party, Karl Ziegler and Heinz Breil, was in the interference but has not appealed, and that party's presence in the interference is of no significance in resolving the issues before us.

Anderson took testimony, while Pieper stood on his priority date. The board, in awarding priority to Pieper, held against Anderson on both of his major contentions, namely, (1) That Pieper was not entitled to make the count because he had disclaimed the subject matter thereof; and (2) that, even if Pieper could make the count, Anderson had established actual reduction to practice before Pieper's priority date. We find that Anderson did establish actual reduction to practice before Pieper's priority date. Hence, we need not reach the question of disclaimer by Pieper.

As stated above, Pieper's priority date was June 9, 1954. Anderson contends that his evidence establishes actual reduction to practice on March 19, 1954.

The count, as set forth above, defines a method of producing solid polyethylene. Two steps are involved. First, titanium tetrachloride, a compound in which titanium exhibits a valence of four, is reduced to the dichloride, in which it exhibits a valence of two, by mixing with aluminum. Second, the dichloride is put in contact with ethylene. Polymerization of the ethylene then occurs, and it is said that this result is achieved over a wide range of temperatures and pressures. Anderson's specification, for example, states that temperatures from 25°C to 250°C or higher may be employed, and that good results are obtained at pressures from one to 200 atmospheres. It is not completely clear that *solid* polymer is obtained throughout these temperature and pressure ranges, although the Pieper specification indicates that this is so by noting that temperatures up to 400°C and pressures up to 200 atmospheres can be used and that "[t]he softening point [of the product obtained] varies according to manufacturing conditions between 100°C and approprixately 150°C." The Pieper specification also states generally that "predominantly solid polymers of ethylene are formed when using the titanium catalysts hereinbefore described."

Turning now to Anderson's proof, Truett, who is Anderson's co-inventor, testified that he carried out certain experiments on March 2, and March 5, 1954. In each of these experiments a mixture of titanium tetrachloride and aluminum was prepared by Truett in his laboratory and the mixture was then taken to the High Pressure Laboratory at DuPont, assignee of the Anderson application. The mixture was there charged into a stainless steel tube, or "bomb," where it was heated to cause a reaction between the titanium tetrachloride and the aluminum. The bomb was then pressured with ethylene and heated. Truett identified notebook entries describing the portions of these experiments which were carried out in the High Pressure Laboratory. The entries were made by Stephens, Banks and Earley, all of whom testified in the case. The entries contain statements such as "Recovered product from open tube," but neither the entries nor the testimony of the entrants indicated that the product obtained in the experiments was necessarily solid.

Truett himself testified that the products were solid, and he identified his own notebook entries on the experiments. These were received in evidence and contain the notations "The reaction vessel was solid with polymer" and "The reaction product was soid + oil."

The record makes it clear that the products obtained in these experiments were turned over to a Dr. Merckling. Dr. Merckling was deceased at the time of the proceedings in this case. However, his notebook entries purporting to describe his testing of the products in question were received in evidence without objection, a thorough foundation of authenticity and admissibility having been laid through witnesses familiar with his handwriting and with practices

at the laboratory relative to notebook entries. The entries bear dates between February 24 and March 19, 1954, and purport to have been witnessed on various dates between February 26 and March 23, 1954. The witnesses to the entries did not personally observe the tests recorded in those entries. The entries themselves, considered in conjunction with testimony interpreting them, are the only independent corroborating evidence that the products tested were high-molecular-weight, *solid* polyethylene.

The board, after setting forth the foregoing analysis of the evidence, an analysis which is not contested by Pieper, concluded that Anderson's proof was insufficient in that it lacked adequate "corroborating evidence that the desired product, a solid polyethylene, was produced."

The board found that the record did adequately establish the facts that in March 1954 mixtures of aluminum and titanium tetrachloride furnished by Truett were heated in a "bomb" at the High Pressure Laboratory and that the bomb was pressurized with ethylene and further heated. The board added: "We consider that the testimony of Stephens, Banks and Earley when considered with all the surrounding circumstances is sufficient to corroborate the assertion of Truett that the above mixture was charged in the 'bomb'."

On the question of whether a *solid* polymer was produced, the board found, and we agree, that the only evidence tending to corroborate the inventors' testimony and notebook records was the group of exhibits purporting to reflect work done by the deceased Merckling. The issue is whether, under the circumstances of this case, those exhibits furnished sufficient corroboration on the single point of whether a solid polymer was made in March 1954. The board decided this issue in the negative, stating:

Neither Robinson nor Settlage testified as to having any firsthand or direct knowledge of the work said to have been carried out by Merckling. Hence, since Merckling did not testify, these exhibits amount to no more than hearsay. Notebook records or reports of persons not testifying can not be regarded as proof of the experimental work recorded therein. In our view the holdings in Teter v. Kearby [169 F.2d 808], 36 CCPA 706, 79 USPQ 65 71, 72), and Farrington et al. v. Mekeska [155 F.2d 412], 33 CCPA 1073, 69 USPQ 509 (511) are directly in point. * * * [T]here is no evidence (other than the inventors' testimony and notes) that a useful *solid* polyethylene was produced in the experiments in question. Even though Exhibits 6 to 9 were introduced without objection it is not necessary that they be held valid corroboration of the alleged reduction to practice as these exhibits cannot be accorded any greater probative value than is proper under the circumstances. (Emphasis quoted.)

Despite the board's use of the phrase "no evidence," it appears to us from the whole of the quoted passage that the board viewed the exhibits as admissible, which they clearly were, but as lacking sufficient weight to constitute corroboration. The *Teter* case, cited by the board, might appear to support the proposition that notebook entries cannot possibly establish corroboration unless the entrant testifies. However, in *Farrington*, also cited by the board, the court concluded: "*Under the circumstances hereinbefore related,* it is evident that Farrington et al. have not introduced evidence which would justify a holding of conception or actual reduction to practice * * * prior to the filing of their involved application." 155 F.2d at 415, 33 CCPA at 1077–1078. (Emphasis supplied.) What were those circumstances?

In both *Teter* and *Farrington* the parties were attempting to use the entries to establish more than the corroboration of a single fact in question. In neither case was there any indication that the

entrant was dead or otherwise unavailable. In fact, in *Teter* the court noted: "The chemists making the reports were not called as witnesses, and there is nothing in the record to indicate that their attendance had been sought." 169 F.2d at 816, 36 CCPA at 716.

In marked contrast to the facts of *Teter* and *Farrington*, the entries in the present case are relied upon by Anderson for corroboration on a single point only, and the entrant was as unavailable to testify as one could ever be.

 Moreover, the "law" on what evidence is sufficient to corroborate is now a rule of reason. Berry v. Webb, 412 F.2d 261, 56 CCPA 1272 (1969); see also Beeber v. Grogh, 403 F.2d 743, 56 CCPA 880 (1968); Patterson v. Hauck, 341 F.2d 131, 52 CCPA 987 (1965). We agree with Anderson that application of the rule of reason in this case compels the conclusion that the notebook entries of Merckling corroborate the inventors' testimony that a solid polymer was produced. The entries were thoroughly authenticated, a complete foundation for admissibility was laid, and the entrant was unavailable to testify. The circumstances surrounding the making of the entries are in this case convincing as to reliability of the entries for their truth. Moreover, the entries are relied upon to corroborate only a single point, i. e., whether the products were solid. In this connection we again point out that Pieper's own specification indicates that solid polymer is produced over wide temperature and pressure ranges using a titanium dichloride catalyst. Therefore, it appears that the notebook entries are being offered to corroborate a point on which there should be little doubt in the first place.

In view of the foregoing, we conclude that the board erred in finding Anderson's proof insufficient to establish prior reduction to practice.

The decision of the board is reversed.

Reversed.