**William N. BENNETT, Appellant,**

v.

**Rudolph M. SEROTA, Appellee.**

**Patent Appeal No. 8782.**

United States Court of Customs and Patent Appeals.

May 24, 1973.

Morris I. Pollack, attorney of record, for appellant.

John W. Renner, Charles B. Lyon, Donald D. Jeffery, Cleveland, Ohio, attorneys of record, for appellee.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

ALMOND, Senior Judge.

This is an appeal from the decision of the Board of Patent Interferences awarding priority of invention to Serota, the junior party, as to two counts relating to an apparatus for heating a traveling web of dielectric material [1] such as paper. We affirm that decision.

The senior party Bennett became involved in this interference on his application serial No. 368,455 filed May 15, 1964. Serota became involved on his application serial No. 499,754 filed October 21, 1965, a continuation-in-part of an earlier application, serial No. 385,130, filed July 27, 1964.

At final hearing before the board, the attorney for Bennett stated that Bennett relied for priority solely on the filing of his application. Accordingly, the board restricted him to his May 15, 1964 filing date for both conception and constructive reduction to practice. The board held that Serota, as junior party, had met his burden of proof by showing an actual reduction to practice in January 1964. The board also held that Serota was entitled to prevail for the reason that Bennett was not an original inventor. In its view, the evidence was sufficient to show derivation of the invention by Bennett from Serota.

*The Subject Matter*

As originally declared, the interference involved a single count which corresponded to claim 34 of the Bennett application and claim 3 of Serota's application. Later a second count was added at the instigation of Serota. This count is in some respects broader than count 1. Since it is our view that Serota was entitled to priority as to count 1, we need not consider his allegation of an even earlier reduction to practice of count 2.

Count 1 reads as follows (subparagraphing ours):

1. Apparatus for heating a traveling web of dielectric material comprising

a grounded metal frame,

a first capacitor plate fixedly mounted on said frame,

a first series of horizontal electrode rods disposed transversely to the direction of travel of said web and carried by said first capacitor plate above the latter and in electrical connection therewith,

a second series of electrode rods interpose between and parallel to said first series of electrode rods and lying in the same horizontal plane, said second series of electrode rods being grounded to said frame,

means for vertically adjusting said frame and thus said electrode rods to variably position the same relative to said traveling web,

a second capacitor plate mounted on said movable frame below said first capacitor plate,

said second capacitor plate being connected to a source of high frequency electrical energy,

means for vertically adjusting said second capacitor plate relative to said first capacitor plate thereby to vary the current in said first capacitor plate and in said electrode rods.

---

[1]. Dielectric material is defined as "A material that can serve as an insulator because it has poor electrical conductivity. * * * A dielectric undergoes electric polarization when subjected to an electric field." J. Markus, Electronics and Nucleonics Dictionary (3d ed. 1966).

A basic structure upon which this claim will read is shown in figures 1 and 2 of the Serota application which are reproduced below:

*Fig. 1.*

*Fig. 2.*

In those drawings rods 40 and 44 are electrodes. Rods 40 are grounded to the frame, whereas rods 44, in the same plane as rods 40, are connected to a fixed capacitor plate 42 which is insulated in its mounting in frame 10. There is also provided a second capacitor plate 46 which can be adjusted vertically to vary the distance between it and plate 42. The adjustable capacitor plate is connected to the ungrounded terminal of a source of high-frequency electrical

energy. The frame itself can be raised or lowered relative to the web of dielectric material passing over it.

In operation, a high-frequency voltage is delivered to the adjustable plate which induces voltage in the fixed plate and rods 44. This voltage creates a difference in potential between rods 44 and 40 thereby generating an electric field between them which is in the same plane as a web (not shown) passing over the electrodes. This electric field creates the dielectric heating [2] effect in the web.

### Record

The record establishes that Serota began investigating the phenomenon of dielectric heating as early as 1959. During that time he designed a test apparatus for drying continuous webs of dielectric material. This apparatus was used to demonstrate to potential customers the feasibility of using dielectric heating for drying webs. Although not intended for commercialization, this test rig is the basis of Serota's claim to a reduction to practice of count 2.

This apparatus was in fact a modified conventional dielectric oven. Two sets of electrode rods were assembled so that one set was interposed and in the same plane as the other, as is called for by count 1. The assembled electrodes were inserted in the oven in a way that one set was grounded and the other insulated from the oven which functioned as a frame. The electrode assembly included a capacitor plate located above and parallel to the plane of the electrode rods. It was electrically connected to one set of electrode rods and functioned in the same way as that of the first capacitor plate of count 1. However, it will be noted that in count 1 this plate is *below* the electrode rods. Above this plate was a second capacitor plate, a part of the oven, which could be energized and adjusted vertically relative to the first plate by means of a pulley arrangement. In operation the web to be dried passed

over the electrode rods. The board said of this device:

\* \* \* we find that the structure shown in those exhibits, shown in one exhibit in use with a conventional oven, does not support the counts here in issue. We note, however, that the applicator included a system of alternately grounded and energized electrodes all in a single plane disposed to one side of the web of material to be dried, as in the invention in issue.

In addition, we note that this structure also embodies the concept of a fixed capacitor plate in which a voltage can be induced by a movable capacitor plate. However, of necessity the web had to pass over the rods but under the first capacitor plate. That Serota was indeed the originator of this apparatus was corroborated by testimony of his assistant, Zimmerly.

The record further reveals that Serota traveled to the Fitchburg Paper Co., the assignee of the Bennett application, at its request to discuss the acquisition by Fitchburg of some radio frequency generating equipment from Young Brothers Co., Serota's employer and assignee of his application. This trip took place on April 10, 1963.

Serota testified that on this visit he met Bennett, his adversary in this case, and learned that Bennett was constructing some sort of dielectric heating apparatus for Fitchburg that required the generating equipment referred to above. When it was learned that Young Brothers could not provide this equipment, Serota was engaged to be a consultant for Fitchburg.

Serota further testified that Bennett's apparatus, which he saw on this or a later trip, was the same as that illustrated in a patent Bennett later acquired, U.S. 3,266,164 (Exh. 7). This device is quite different from that which is involved in this interference. In particular, the electrode rods do not lie in the same plane. Instead, they are in parallel rows

---

2. Dielectric heating is defined as "The heating of a nominally insulating material by placing it in a high-frequency electric field." *Id.*

and offset from each other. Because of this arrangement, the web to be dried had to pass between the rows of electrodes rather than over them. We also note that this apparatus did not use a pair of capacitor plates, one of which is movable relative to the other. That Bennett was engaged at this time in building such an apparatus is corroborated by the testimony of Bennett's witness LaBlanc.

The record further reveals that Serota made numerous visits to Fitchburg after his retention as a consultant. LaBlanc testified that Serota went to Fitchburg over the years 30 or 40 times, and that their first meeting was in 1963. Serota testified that, as a result of his association with Fitchburg, it was decided that Serota and Young Brothers would "design and build" a unit to replace the one he had seen at Fitchburg, for the reason that the parties had been unable to make the Bennett apparatus work successfully.

Although Serota was unable to say precisely when this decision was made, he submitted various documents (Exhs. 11–15, 17, 18) to substantiate this claim and which indicate that an apparatus was eventually shipped to Fitchburg. The board summarized these exhibits as follows:

(1) A letter directed to Fitchburg, dated October 2, 1963, signed by Serota, confirms discussions had previously with respect to an applicator system with price quotations. (Exh. 15). This letter indicates that Young Brothers Company was

"to design and build an applicator which will have all electrodes under the paper ----. Applicator to have variable output control . . . Bottom section shall be capable of lowering ----."

(2) A purchase order No. 18485 by Fitchburg, (Exh. 13) dated October 22, 1963, directed to Young Brothers Co., referring to the above-noted letter of October 2, 1963, listing various items and finishing:

"All in accordance with your letter and discussion between our Mr. Bennett and your Mr. Serota."

This bears an indication of receipt by Young Brothers Co. on October 25, 1963.

(3) and (4) Two sales orders (Exhs. 11, 12) on Young Brothers Co. forms, dated October 26, 1963, relating to the work to be done under the above-noted order,

(5) A letter (Exh. 17) dated December 24, 1963, from Serota to Schreiber of Fitchburg with respect to shipping a unit on Monday, December 30, 1963, to be delivered January 2, 1964

(6) Another letter (Exh. 18) from Brigham of the Traffic Department of Young Brothers Co., dated December 27, 1963, to Fitchburg referring to their order number 18485 and indicating shipment to be on December 30.

(7) An invoice (Exh. 14) from Young Brothers Co., No. 7063 dated December 31, 1963 referring to Fitchburg's order, indicating that shipment had occurred.

Serota also testified regarding a drawing (Exh. 21) prepared by one Williamson and dated October 31, 1963. He identified the drawing às "an assembly drawing of the prototype electrode system designed and built for Fitchburg Paper." He further stated that it was a drawing of the apparatus shown in photographs taken before and after shipment from Young Brothers and installation at Fitchburg (Exhs. 16, 19, 20).

The board characterized this drawing as being identical to that of figures 1–3 of Serota's application but for a minor omission and said:

We find further that the structure shown in detail in those figures of the Exhibit 21 drawing clearly and adequately support the language of both counts to the same extent that the structure illustrated in the application drawings does and we note that no question as to Serota's right to make

the counts in issue has been raised in this case.

It was after its review of the record, a more extensive one than our summary, that the board held that Serota had proved by a preponderance of the evidence that he had reduced the invention to practice in January 1964 and that Bennett had derived the invention from him. Appellant attacks this decision on the grounds that (1) Serota failed in his burden of proof in the sense that there was insufficient corroboration of his own testimony, (2) Serota failed to prove conception and reduction to practice, and (3) there was no basis for the board's conclusion that Bennett had derived the invention from Serota.

## Opinion

◼ Inasmuch as we agree with the board that Serota proved a reduction to practice in January of 1964, we do not find it necessary to reach the question of derivation.

Appellant's principal attack on the board's decision is that it relied too heavily on Exhibit 21, the drawing by Williamson. It is apparently his view that the board regarded that drawing as proving Serota's reduction to practice. We believe that this misconstrues the board's decision.

We first note that the board referred to the reduction to practice as occurring in January 1964 and it is our opinion that there was clearly a reduction to practice at that time embodied in the unit installed and tested at Fitchburg. In fact, appellant's preliminary statement relied upon that unit as a reduction to practice on his behalf and thus constitutes an admission that the unit supported the count, thus corroborating Serota's testimony and exhibits notwithstanding the fact that appellant later chose to rely solely upon his application for priority.

◼ It is our view that unlike the usual interference case the question to be resolved is not whether there was a reduction to practice but whether the reduction to practice was Serota's. Of course, for Serota to prevail this must be shown by a preponderance of the evidence and where that evidence relies upon Serota's testimony, it must be corroborated. Rodin v. Spalding, 297 F.2d 256, 49 C.C.P.A. 870 (1962); Hasselstrom v. McKusick, 324 F.2d 1013, 51 C.C.P.A. 1008 (1963).

The evidence, when seen in perspective, we think is sufficient to meet appellee's burden of persuasion which is to show by a preponderance of the evidence that the reduction to practice in January 1964 was of his invention. The record shows that Serota was early involved in the design of dielectric heating equipment and devised an apparatus similar in many respects to that shown in the drawings of his application. When Bennett arrived on the scene at a later date, the only device which the record shows to be his own was of a significantly different type from that involved in the counts.

The record further shows that Serota's employer was requested to "design and build" an apparatus for Fitchburg when Bennett's device could not be made to operate successfully. This request was followed by the reduction to practice already discussed above.

Corroboration included the testimony of Zimmerly and LaBlanc, the documents discussed by the board, and Williamson's drawing. Appellant objected that Williamson himself was not called to corroborate the drawing. However, we note that there was no challenge to the authenticity of the drawing. Thus, considering the purpose for which the drawing was used in the evidentiary scheme, testimony by Williamson would be cumulative at best, and we consider this omission to be of no consequence.

From this evidence we think it was logical and, therefore, proper to infer that Serota was the inventor of the January 1964 device. Appellant argues that the corroboration is insufficient. How-

ever, this court observed in *Hasselstrom, supra,*

> \* \* \* the purpose of corroborative evidence is to confirm and to strengthen the testimony of the inventor. Obviously the amount and quality of corroborative evidence that is necessary in any given case will vary with the facts of that case. [Citation to footnote omitted.]

 We are satisfied that were it not for the vendor-vendee relationship of the parties, the evidence produced by Serota would without question support his claim to priority. We see no reason to reach a different result merely because of that relationship. For his part, appellant, as noted by the board, has not put forth a case to contradict that put forth by Serota even though if contrary evidence existed it was peculiarly within his province to produce it. Furthermore, any additional corroborative evidence for Serota would no doubt have to come from appellant who is his adversary in this contest. A degree of corroboration that is impossible is not required. Hurwitz v. Poon, 364 F.2d 878, 53 C.C.P.A. 1502 (1966).

The "law" on what constitutes sufficient corroborative evidence is a rule of reason. Anderson v. Pieper, 442 F.2d 982, 58 C.C.P.A. 1221 (1971) and cases cited therein. We believe that application of that rule of reason to the facts of this case requires the conclusion that the evidence discussed above is sufficient corroboration of the testimony of Serota.

In view of the foregoing, we conclude that the board did not err in awarding priority to Serota. Accordingly, that decision is affirmed.

### Taxation of Costs

Appellee in this case requested that the brief for Bennett before the Board of Patent Interferences be added to the record with the praecipe making the request. We do not believe that addition to the record was necessary for a fair understanding and consideration of the issues presented in this case. Accordingly, the cost of printing this brief and praecipe is assessed against the party Serota.

Affirmed.