53 CCPA

**Melvin D. HURWITZ, Appellant,**

**v.**

**George SHIU YIM POON, Appellee.**

**Patent Appeal No. 7537.**

United States Court of Customs and Patent Appeals.

Aug. 11, 1966.

John A. Sarjeant, Wilmington, Del., Carl A. Castellan, John F. Bergin, T. Wallace Quinn, Philadelphia, Pa., for appellant.

Eugene Sabol, Washington, D. C., for appellee.

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

MARTIN, Judge.

This is an appeal by the senior party Hurwitz from a decision of the Board of Interferences, awarding priority of the sole count in interference No. 91,821 to the junior party Poon upon an actual reduction to practice in 1955 prior to the filing date of the earliest application upon which Hurwitz relies.[1]

The invention of the count relates to a resin treatment of cellulosic textiles, for the purpose of crease-proofing the textile, that is, imparting wrinkle or crush resistance thereto while minimizing disadvantages of prior art processes. This is accomplished by using a mixture of two resins, each of which had been used separately in the prior art for the same purpose. The count reads:

1. A process for treating cellulose textiles comprising applying thereto an aqueous solution of a curable mixture of (a) a water-soluble urea-formaldehyde condensate and (b) a compound of the formula:

wherein R is an alkyl group having 1–4 carbon atoms, the mole ratio of (b) to (a) being from about 1:1 to about 3:1, based on the amount of combined urea in said condensate (a) and thereafter heating to dry and cure the resin.[2]

When the urea-formaldehyde condensate alone was applied to such fabrics, the fabrics picked up chlorine in sub-

---

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

1. The senior party Hurwitz is involved in this interference upon the basis of an application Serial No. 35,449, filed June 13, 1960, which has been accorded the benefit of application Serial No. 517,062, filed June 21, 1955, on which Patent No. 2,901,463 was granted August 25, 1959, and which is assigned to Rohm and Haas Company.

The junior party Poon is involved in this interference upon the basis of an application Serial No. 667,824, filed June 25, 1957, a continuation-in-part of an application Serial No. 584,443, filed May 14, 1956, now abandoned, and assigned to Dan River Mills, Inc. (hereinafter Dan River).

2. The "compound of the formula" in the count is chemically identified as either dimethylol – 5 – alkyl – tetrahydro – s – triazone – 2 or 1, 3 – dimethylol – 5 – alkyl – tetrahydro – 2 (1) – s – triazone. Since the evidence submitted in this interference is directed to the species in which the 5 – alkyl radical is ethyl, we refer for brevity to the species as "triazone" or "ethyl triazone" and to the generic class as "triazones."

sequent laundering. The retained chlorine then was converted to hydrochloric acid when the fabric was ironed, and the acid yellowed the fabric, reducing its strength. If a triazone alone was applied, the treated fabrics frequently discolored upon heating or ironing. Thus, the invention of the count is stated to be based on the discovery that triazones when mixed with urea-formaldehyde condensates before application to fabrics reduce the chlorine retention damage characteristic of such condensates and reduce or eliminate the yellowing problem normally characteristic of triazones.

The present interference involves pending applications on both sides and thus Poon's burden is to prove reduction to practice by a fair preponderance of the evidence. The party Poon took extensive testimony. The party Hurwitz took no testimony but filed a Notice under Rule 282 introducing various publications. Poon took testimony in rebuttal to Hurwitz' Notice. Thus the critical date prior to which Poon must prove reduction to practice is June 21, 1955, the filing date of the Hurwitz parent application.

By way of background but without assuming the accuracy of each detail which we shall consider below, Poon's story is generally the following. The party Poon took testimony establishing what the board concluded was actual reduction to practice before the end of May 1955. Poon principally relied on laboratory experiments conducted by Joanne Spangler, two runs in the Dan River pilot plant, and two runs in the Number 5 mill of Dan River's finishing plant. Dr. Wayland, leader of a resin group with Poon and Underwood that was formed in 1954, testified to the preparation of A–15, said to be the triazone, and UX, a modified urea-formaldehyde condensate composed of urea, formaldehyde and acrolein.[3] Poon mixed A–15 with UX to get a solution designated A–18. Canter, the

pilot plant director, applied A–18 to fabrics in mid to late April 1955 and also on May 17, 1955. Another combination consisting of A–15 and a melamine-dimethylol-ethylene urea resin designated Y–39 was applied by Canter and Brooks to fabric in Finishing Mill No. 5 in early May. Miss Spangler applied A–15 plus Rhonite 610, said to be a 60% paste of dimethylol urea, to textiles on May 12, 1955. The cured fabrics were tested by technicians in Dan River's testing laboratories under the direction of Mathewson. Stam witnessed Poon's disclosure on May 12, 1955.

Appellant contends that the board erred in accepting UX resin as meeting the "urea-formaldehyde condensate" of the count, since the testimony and documents of Poon shows that UX consists of urea, formaldehyde and acrolein. Documents submitted by Hurwitz under Rule 282, including a patent to Kohler, U.S. 2,600,780, and a Shell Chemical Corporation Bulletin entitled "Acrolein, Its Chemistry and Its Applications" indicates that acrolein under certain conditions would react with the urea, and the resulting product would further condense with formaldehyde.

Further, on cross-examination of Dr. Wayland, the following exchange took place:

Q312. Does this acrolein react with the urea?

A. We presume that it does.

Appellant also adverts to the prosecution of the involved Poon application in which claims were drawn to "urea formaldehyde," which the examiner criticized since it "even reads on the triazone-formaldehyde condensates of the instant case * * *." Appellant notes that Poon then replaced the criticized phrase with a Markush group "consisting of urea formaldehyde, acrolein modified urea formaldehyde, dimethylol ethylene urea and tetramethylol acetylene diurea."

3. Although Dr. Wayland was on a tour of duty with the Army between Sept. 1954 to Sept. 1956, there is testimony that he was retained as a consultant by Dan River and continued to receive copies of Poon's and Underwood's weekly progress reports.

In Poon's amendment submitting the new claims, appellant notes that Poon urged:

First, it is believed that Examiner's definition of the term "urea formaldehyde" is inconsistent with both the definition found in the specification and the definitions known in the art. In Applicant's specification at page 3, second full paragraph, it is stated:

"Urea formaldehyde is most commonly used in the form of dimethylol urea, but there are many other closely related urea formaldehydes falling within the scope of this invention. Also within the scope of this invention are the following specific compounds:

tetramethylol acetylene diurea acrolein modified urea formaldehyde thiourea formaldehyde dimethylol ethylene urea dicyandiamide formaldehyde"

Thus Examiner will see that by Applicant's own language the "also" in the second quoted sentence clearly separates dimethylol ethylene urea and acrolein modified urea formaldehyde and tetramethylol acetylene urea from the term "urea formaldehyde". * * *

Appellant concludes that during the prosecution Poon repeatedly distinguished urea-formaldehyde condensates from acrolein modified urea-formaldehyde, the latter thus being placed outside the scope of the count expression "urea-formaldehyde." In this regard appellant states that in the count in issue, suggested to both parties by the examiner, that phrase had its origin in the claims of the involved Poon application, Hurwitz's application using the terminology "water-soluble condensates of formaldehyde with * * * urea * * *." Appellant also notes that the Markush terminology in Poon's application would be inconsistent, allowing terms to overlap if "urea-formaldehyde" were to include an "acrolein modified urea-formaldehyde."

We do not agree with appellant that an interpretation different than that placed by the board on the phrase "a water-soluble urea-formaldehyde condensate" is proper under the circumstances of this case. We have reviewed the 800 page record but are convinced that the board was correct in interpreting the phrase as inclusive of acrolein modified urea-formaldehyde condensates.

The term involved is in fact "a * * * urea-formaldehyde condensate" not urea-formaldehyde, in the sense of *only* urea-formaldehyde, as appellant contends. Our review of the applications convinces us that the inventions of the two parties are indeed the same, and that the examiner, in proposing a count that was representative of the common subject matter, chose what was to be taken as a reasonably generic term to cover the various resins. It is not inconsistent that a generic term may form the basis of a common count while the parties each resort to somewhat different Markush terminology. It is well settled that an interference count should be given the broadest construction it will reasonably support. Mahan v. Doumani, 51 CCPA 1516, 333 F.2d 896. None of the applications involved herein use the precise term "a * * * urea-formaldehyde condensate," and the nature of the invention disclosed in them does not warrant such a narrow construction. The term reasonably covers the gist of the invention. See Hall v. Taylor, 332 F.2d 844, 51 CCPA 1420.

Further, the record indicates that the term "urea-formaldehyde" relates not to a single compound, but to a number of forms, including mono-, di- and trimethylol urea and so-called "polymeric" forms many of which are of undetermined composition. The patent to Kohler is one which Poon cites in his application to show how to make the acrolein modified urea-formaldehyde resin. Kohler indicates that the acrolein is used for the purpose of stabilizing the condensate. Similarly, appellant, himself, used methanol to modify and stabilize urea-formaldehyde condensates. The comments of the examiner must be interpreted within their entire context from which it is clear

that the objection was that urea-formaldehyde covers the triazone B component,[4] which objection was, from the record, not repeated. It is not Poon's position that the acrolein modified form is *the same as* a condensate of only urea and formaldehyde, but that each is "a water-soluble urea-formaldehyde condensate."

Finally on this point we note that appellant's arguments here for a narrow construction are not entirely consistent with those made below for a broader construction. Poon noted before the board:

> * * * that all of the Hurwitz applications here involved fail to set forth any specific mixtures of a triazone and a product made by condensing urea and formaldehyde *only*. The Hurwitz applications also fail to set forth any specific application of such mixtures to cellulosic textiles. These omissions were duly brought to the attention of the Primary Examiner on a Motion to Dissolve (October 2, 1961) this interference against the party Hurwitz. The party Hurwitz, by Brief dated January 10, 1962, vigorously opposed the Motion to Dissolve on the grounds that the term "water soluble urea-condensate" does not have a narrow construction and that Examples 2 and 4, directed to dimethoxymethylurea and diethoxymethylurea, of his applications disclose specific embodiments under the invention of the count. The Primary Examiner held for the party Hurwitz and denied the Motion to Dissolve.
>
> In the event that a narrow construction is asserted for the term, the party Poon brings the Motion to Dissolve for review by this Board and urges dissolution of the interference against the party Hurwitz for failure to provide adequate support for the count in any of the Hurwitz applications. * * * [Emphasis added.]

Appellant, although stating that "the Examiner's decision on the motion was not based on a broad construction of the aforesaid term [water-soluble urea-formaldehyde condensate]," did urge that:

> Thus, when the count is properly construed to cover all water-soluble condensation products of urea and formaldehyde, it is clear that Hurwitz has adequate support, since dimethylol urea is admittedly one of those (Wayland p. 245).

Thus, we view the Poon acrolein modified form to be within the scope of the count and Poon's evidence relating thereto is relevant on the issue of reduction to practice.

Appellant's second major point is that Poon's proofs do not show that A–18 was a mixture of a water-soluble urea-formaldehyde condensate (UX) and a triazone (A–15) in the proportions defined in the count. The count requires a "mole ratio" of specified values "based on the amount of combined urea in said condensate." Appellant contests the following conclusion of the board as to the mole ratio of reactants as specified in the count:

> * * * the applications disclosures and the experimental evidence in the record do not justify setting sharply precise limits to the proportions. * *

We have reviewed the record and find we must agree with the board in the above conclusion. We find it significant, as did the board in the missing portion of that quote, to advert to the count which sets only approximate proportion limits of "*about* 1:1 to *about* 3:1." (Emphasis added.) Thus we find no reversible error in the board's further statement:

> * * * If therefore the proportions used by the Dan River people should have in fact been somewhat over the 3:1 mole ratio, even as high as 3.5 to 1, and the results of the invention distinctly attained, the invention defined by the count was reduced to practice.

More serious, however, is the argument concerning the phrase "based on the

---

4. The triazone itself is made from urea, formaldehyde and, for example, ethylamine.

amount of combined urea in said con-densate." It is appellant's view that the board thought the term meant merely that reacted urea rather than unreacted urea should be the basis of the ratio. Thus, if two moles of urea are used as a reactant to make the count component (a) resin, UX, but only one mole reacts to form part of the condensate, regard-less of the amount of total urea in the condensate and remaining solution, 1 mole would be the basis against which 1 to 3 moles triazone component (b) is to be added. Appellant contests the fol-lowing passage of the board as showing it misunderstood the significance of the limitation and overlooked the fact that it had been inserted in Poon's claims to meet the examiner's rejection. The board's contested passage states:

> * * * If the proportion of "com-bined urea" as distinguished from combinable urea present was a mark of differentiation between the inven-tion practiced by Poon and an improve-ment invention disclosed by Hurwitz we would put the party Poon to stricter proof on the matter, but we find no suggestion in the case that this is true.
> * * *

In appellant's view the board was chang-ing in the count the term "combined urea" to combinable urea, the amount put into the reaction vessel rather than the amount in the UX resin product.

This issue requires a review of both the count (a) resin component (UX) and the (b) triazone component (A–15). It is not feasible here to reproduce in its entirety appellant's analysis of this high-ly technical point. Representative of ap-pellant's argument as to the (a) resin component, appellant states:

> * * * Wayland gave contradictory evidence as to the amount of urea-formaldehyde condensate present in the [UX resin] solution. In March 1963, he testified that UX contained 0.337 mols urea-formaldehyde conden-sate per 100 grams. By August 1963, he had revised his estimate and in re-buttal (as discussed in more detail

hereinafter) he testified that 60.0 per cent of the urea used to make UX was available for reaction with formalde-hyde after an initial reaction with ac-rolein "resulting in 0.204 mols of the condensate of urea and formaldehyde per 100 grams of UX" (R 482). He based this new estimate, which was ap-proximately 60% of his original esti-mate, on tests which were conducted in 1963, approximately 8 years after Hur-witz's filing date (R 470).

There is no testimony as to either the molecular weight, or the number of molecules of urea combined in a single molecule, of the urea-formaldehyde condensate. Hence, there is nothing in the record from which the mole ratio of triazone to urea-formaldehyde con-densate, "based on the amount of com-bined urea in the condensate", as re-quired by the count, can be determined.

That new estimate by Wayland of the moles of urea-formaldehyde in UX was based on rebuttal testimony of Dr. Wat-son who described an experiment he car-ried out in 1963, in which urea and acro-lein were reacted. The reaction products were subsequently analyzed by Hoffman, who also testified in rebuttal, to deter-mine the amount of unreacted urea. Ap-parently no attempt was made to analyze UX directly then or earlier, Wayland having originally testified on cross-examination:

> Q314. From this, Doctor, do—is it correct to assume that the exact nature of the product identified as UX has never been specifically identified? A. The exact and detailed composi-tion of all components of the product have not been quantitatively identified.

Appellant urges that the Watson experi-ment was non-analogous, i. e., the condi-tions did not correspond to those in the original preparation of UX, since acetic acid was present but formaldehyde was not.

Regarding the count triazone com-ponent (b), appellant argues:

> On direct examination Wayland stated that A–15 is an aqueous solution

of triazone, containing 41.8% solids and 0.216 mols of triazone per 100 grams (R 239). He later admitted that his calculation of the mols of triazone in A–15 "was based upon a theoretical calculation based on the reactants added" (R. 293). It is an indisputable fact that the record is devoid of any chemical analysis of A–15 and the witness recognized that the A–15 "reaction like most chemical reactions probably does not result in a 100 per cent of the theoretical yield of the desired product, triazone" (R 288).

\* \* \* On May 9, 1955 the inventor Poon prepared a document entitled "Disclosure No. 382". In this contemporary document, Poon stated that in his opinion the formation of triazone in A–15 "was at a much smaller extent than the theoretical amount" (Ex. P 78).

Our attention is also directed to the fact that Wayland testified that all the formaldehyde was in the reaction vessel prior to adding urea and ethylamine in the production of A–15 triazone while a Wayland report dated September 23, 1954, Exhibit P–7, indicates that in early 1954 formaldehyde was added in two stages to make A–15, therein termed "dimethylol triazone." Appellant concludes that all of Wayland's testimony on the mole figure for triazone must be discredited:

> In view of 1) the disagreement between Poon (Exh. P–78) and Wayland (R 293) as to content of triazone in A–15, 2) the lack of correspondence between known prior methods of making the triazone and the method used in making A–15, and 3) the fact that Wayland's testimony based on theoretical considerations has been admitted by Wayland himself to be unreliable as to UX resin by virtue of his changing his original figure of 0.337 mole per 100 grams of UX to 0.204 mole per 100 grams, it is respectfully submitted that Wayland's figure of 0.216 mole triazone per 100 grams A–

15 must be *discredited*, whether the A–15 is a standard chemical or not.

In spite of the first blush strength of the above arguments, a closer examination of them in the light of the entire record convinces us that no error has been shown in the board's holding that the evidence adduced by Poon meets the count limitation based on the combined urea within the required mole ratios. Our starting point is Young v. Bullitt, 233 F.2d 347, 43 CCPA 932, wherein this court stated that:

> \* \* \* a complete chemical analysis is not always necessary to identify a product, but that various other factors, including the materials used, the procedures followed, and the skill and experience of the experimenters, are to be considered.

> The question generally is whether, when all the circumstances are considered together, there is a reasonable certainty as to the identity of the product. Proof beyond a reasonable doubt is not necessary where, as here, the applications of the parties were copending.

Recall that here both parties admit that the component resins have been used separately in the prior art. All the materials used to make both A–15 and UX were standard materials purchased from reputable manufacturers in the ordinary course of trade. Regarding the triazone, appellant has cited under Rule 282 a patent to Martone that itself is probative to show a procedure was well known to result in the triazone of the count. There is also no evidence that the triazone was not produced as expected or that it was anything else, in spite of appellant's opportunity to adduce evidence to the contrary.

We think significant here is the "solid practicality," as referred to by the board, of the process, and the component resins. There is convincing testimony that the Dan River chemical plant between February 1954 and the end of 1955 produced three million pounds of A–15 for use in the regular production finishing as well

as some going to "outside sales." Dr. Wayland's identification of A–15 is substantiated by Miss Spangler (as a solution containing 42% triazone), and by Underwood, both research chemists, and by the Poon report, Exhibit P 7 (as a solution containing 44% triazone). Similarly, the UX resin is adequately substantiated to have been produced in the Dan River chemical plant in the amount of 860,000 lbs., between March 1953 and March 1955. Regarding the A–18 mixture of A–15 and UX, the board stated:

> * * * We note that Allen had made, prior to the end of May, 1955 A–18 in three batches, totaling 13,717 pounds, not a trifling quantity, of which fifteen drums were "sent out to outside sales." * * *

Turning, then, to the challenge of the ratio "based on the amount of combined urea" as distinct from the identification of the compounds, we find appellant's arguments in part speculative and in total unconvincing. As stated in Chandler v. Mock, 202 F.2d 755, 40 CCPA 846, 849:

> When an issue between contending parties as to the priority of invention is decided in the Patent Office, the decision there made must be accepted as controlling upon that question of fact in any subsequent litigation between the same parties, unless the challenged decision is manifestly wrong and the contrary is established by testimony which in character and amount is altogether convincing.

Regarding the mole figure of .216 for the triazone, Dr. Wayland, although indicating that the .216 figure was based on a theoretical yield which may not have been achieved, did find the yield sufficiently high to base the calculation thereon. On redirect examination he stated:

> A. The moles of triazone per 100 parts of A–15 was stated to be 0.216. This figure was based upon a theoretical calculation based on the reactants added. If the yield of triazone from urea was less than theoretical, the moles of triazone per 100 parts of resin would be reduced by a like amount. However, there is no question in my mind that the yield of triazone was very high.

Underwood's testimony was to the same effect. The objection that Wayland's conditions for preparation of A–15 triazone appeared non-standard in view of Martone is not well taken in view of the range of conditions taught in the prior art referred to in the record and briefs. Similarly, more apparent than real is the alleged conflict between the Wayland report and his testimony as to the manner of making A–15. The Wayland testimony appears related to the sequence of addition whereas the report relates to the probable sequence of reaction, which is substantially identical to that related in the Martone patent. Thus we find no sound basis to discredit Wayland's testimony nor to reverse the board's evaluation thereof.

Regarding the allegedly conflicting testimony of Wayland as to the moles of UX in 100 grams of solution, appellee's rebuttal appears to be a substantially correct reading of the record:

> Dr. Wayland did not change his mind. The 0.204 figure refers to the amount of the condensate of urea and formaldehyde which forms from that part of the urea that has not reacted with acrolein. The 0.337 figure is based on the total urea used in manufacturing UX. Moreover, since A–18 contains 3 weight parts A–15 (0.216 mol ethyl triazone per 100 grams) and 1 weight part UX (containing at least 0.204 mol of the urea-formaldehyde condensate per 100 grams which is formed after the first reaction step), the ratio of ethyl triazone to urea-formaldehyde condensate in A–18 based on the 0.204 figure is not greater than 3.1:1 which is "about 3:1", the approximate upper level set forth in the count (R 239, 301–303, 482).

Appellee also notes that:

> * * * The molar ratio of ethyl triazone to the acrolein stabilized urea-

formaldehyde condensate in A–18 amounted to 1.92 based on the combined urea. * * *

We find representative of substantial evidence in the record the following testimony of Wayland as to the UX resin, on cross-examination:

Q306. Would you refresh your recollection and then tell us what the molar relationship would be between the urea and formaldehyde at the time the acrolein is added?

* * * * * *

A. According to my pretty rapid calculations of the moment, the ratio is 5.8 moles of urea to one mole of formaldehyde. That is, this amount of formaldehyde is added with the acrolein. I can turn that around if you would rather have it the other way.

Q307. In other words, for every molecule of urea present, there is considerably less than one molecule of formaldehyde at this stage of the process, is that correct? A. Correct.

Q308. The relationship is 5.8 molecules of urea to one molecule of formaldehyde? A. At this stage of the reaction.

Q309. At this stage of the reaction. A. Yes, sir.

Q310. Can you tell us what the molar ratio is of urea to acrolein at that stage of the process? A. Yes, I can. The mole ratio is .378 moles of acrolein per mole of urea.

Thus the allegation that there is no testimony as to the number of molecules and moles appears quite unfounded.

More fundamentally on this point, it is our view that appellant has not shown where the board erred since it considered both figures, .337 and .204. As appellee notes, even assuming the minimum of .204 moles resin in the UX solution, the count ratio range is met. Although both values appear on the record to relate to the entire resin component of the UX solution as distinct from only the resin's urea component, appellant has not shown the figures to be incorrect or not

properly related to the count, nor has there been any tracing of the reactant amounts through the products to the ultimate mole ratio of triazone to the urea-formaldehyde condensate as "based on the combined urea of said condensate." Appellant took testimony, and it appears consistent with the data shown in the applications that in part gave rise to such mole ratio ranges. That evidence has been evaluated and accepted by the board, and we are without convincing challenge as to the ultimate values. Our views are predicated necessarily on this state of the record and the reliance we must place on the board in such matters of technical detail, Chandler v. Mock, supra.

We think the board's observations on this point are apt:

* * * Further refinement of discussion leads to irresolvables due to the deficiencies in chemical and physical science. We have discussed the matter to this extent only to show what a tenuous ground it is as against the solid practicality of the process as used by Dan River Mills, which we are quite convinced is the invention of the count. * * * Finally, we note Hurwitz example 2 in which the triazone and the "condensate" are combined in the proportions 3:1 by weight as the party Poon did, and the statement is made that the condensate is made of "methanol, formaldehyde, and urea, comprising *largely* dimethoxymethylurea". (emphasis ours.). Hurwitz practical instructions therefore avoid commitment to our discussion of proportions based upon "combined" urea. What is sauce for the goose is sauce for the gander would seem to apply.

A final challenge appellant makes is that there is no showing of utility for the resins. The tests under Matthewson's direction of the pilot plant and mill runs by Canter and Brooks of the mix made from components produced in the chemical plant by Allen and Spencer as an outgrowth of Poon's work is said to be hearsay, apparently on the ground that each person next back in the chain was

not present at each moment of the subsequent step. Thus appellant urges in regard to the reports on the testing of fabrics treated with the composition of the count:

> However, these reports are all objectionable hearsay evidence because neither Matthewson nor any other witness testified that they actually performed or even observed a single specific test. * * *

> During Poon's testimony, Hurwitz's attorney repeatedly objected to all testimony and exhibits reflecting the reports from the testing laboratory since they were clearly *hearsay* in the absence of testimony by one who did the actual tests or at least observed them. In spite of this, Poon's attorney made no attempt to correct this fatal deficiency.

In a similar vein appellant challenges the source of materials as an uncorroborated chain of events:

> Canter was asked where he got the material which he used as A–18 resin in the two pilot plant runs which preceded the mill runs. He replied that it came from George Poon, the inventor (R 314 and 320). There was no attempt by anyone except the inventor to establish the composition of this material and thus it stands on the uncorroborated testimony of the inventor.

On cross-examination, Canter was questioned as follows:

> Q359. Mr. Canter, in connection with various exhibits, you reported that you received A–18 at various times from George Poon or J. W. Allen. Do you recall this testimony, sir? A. Yes.

> Q360. Did you at any time attempt to make a chemical analysis of that product? A. I did not.

> Q361. Did you rely on the identification of the product from information which you received from Mr. Poon and Mr. Allen? A. I relied upon the label on the cans and upon Mr. Poon. When

he gave me his first can it was not labeled.

The following exchange took place on cross-examination of Allen, who was in charge of the chemical plant:

> Q70. You stated, sir, that when the first batch of A–18 was made it was sent out the next day to Number 5 Stores or Mill. Am I correct? A. Yes.

> Q71. Do you know who took it out to the store? A. Our Mill transportation took it out.

> Q72. You did not accompany it when it went out? A. No, I did not.

> * * * * * *

> *Redirect examination by Mr. Sobal:*

> * * * * * *

> Q85. How reliable is Mill transportation? To be more specific, was there ever an instance where Mill transportation lost a label from a drum?

> Mr. Sarjeant: I'm going to object. I don't believe the witness is qualified to answer.

> Q86. Within your experience? A. Within my experience there has been no evidence that that has happened. These drums are stenciled rather than tagged, therefore it is rather difficult to lose their identity.

> Mr. Sabol: Your witness.

> Mr. Sarjeant: That's it.

It is clear to us that such an attempt to apply the hearsay rule is an extreme that is contrary to the rule of reason normally followed by this court. Patterson v. Hauck, 341 F.2d 131, 52 CCPA 987; Mann v. Werner, 347 F.2d 636, 52 CCPA 1578. The degree of corroboration that appellant urges would be to require the impossible. It plainly does not comport with the reality of technical operations involving numerous people necessarily separated from each other in time and distance and each involved in their own highly specialized part of a large operation. There is not one hint in the testimony that the reports, labels, transportation and other procedures were

not routine and accepted as fully reliable by research and production personnel.

In a similar vein, appellant objects to the characterization of the A–15 as being a standard chemical on the ground that "there is no proof that A–15 was a 'standard chemical' to anyone except Dan River," that it may have been standard only "in the sense that whatever it was it produced a desired result," but the count is not phrased in terms of a desired result. However, we find no reason to think that a standard chemical may not be so defined as standard *within* a single operation such as here, at least to the extent that the compositions were properly relied on by the research and processing personnel for what they were labeled to be.

Appellant also urges that the tests of A–18 in place of A–15 in a mixture of the latter with Y–39 in the No. 5 Mill is not a *reduction to practice* since whatever results were obtained can be attributed to the Y–39. We do not agree, since the testimony shows that the A–18 was substituted pound for pound for the A–15 with improved results. In our view one of ordinary skill would ascribe those results to the A–18 resin. In re Widmer, 353 F.2d 752, 53 CCPA ——.

[6, 7] Regarding the utility, since we are satisfied that the chain of corroboration is adequate, we think the reports and testimony adduced are sufficient to show that the A–18 in fact did operate in the *process* to achieve the desired utility of crease proofing fabric. See Breen v. Miller, 347 F.2d 623, 52 CCPA 1539 and Miller v. House, 353 F.2d 252, 53 CCPA ——. Indeed, we note there is testimony that some of the A–18 and fabrics so treated were sent to outside sales.

We have not touched on the testimony of the inventor Poon since it was not attacked except as being uncorroborated. There are, of course, ample corroborating documents, and the witnessed corroborating disclosure prior to the critical date. Further, the work of Spangler in our view is also corroboration. Patterson v. Hauck, supra. We thus need not pass on the issue of joint inventorship with Underwood.

For the above reasons the decision of the board awarding priority of invention of the count to the party Poon is affirmed.

Affirmed.