59 CCPA

**Paul T. PARKER, Appellant.**

v.

**Vincent J. FRILETTE and Paul B. Weisz, Appellees.**

**Patent Appeal No. 8647.**

United States Court of Customs and Patent Appeals.

July 13, 1972.

Rehearing Denied Nov. 9, 1972.

Roy J. Ott, John J. Schlager, Linden, N. J., attorneys of record, for appellants.

Raymond W. Barclay, New York City, attorney of record, for appellees; Richard K. Stevens, Arlington, Va. (Stevens, Davis, Miller & Mosher, Arlington, Va.), of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN, and LANE, Judges, and ROSENSTEIN, Judge, United States Customs Court, sitting by designation.

ALMOND, Judge.

This is an appeal from the decision of the Patent Office Board of Patent Interferences awarding priority to appellees, Vincent J. Frilette and Paul B. Weisz (Frilette), the junior party. Appellant, Parker, is involved on application serial

No. 741,906 filed June 13, 1958, which is assigned to Esso Research and Engineering Company. The five counts in issue are modified forms of claims copied by Parker from Frilette patent No. 3,140,322, which issued July 7, 1964 on an application filed August 14, 1958. The Frilette patent is assigned to Mobil Oil Corporation. The issues here are the sufficiency of each party's proofs concerning reduction to practice.

The invention involved relates to a process for selectively conducting an organic chemical reaction (i. e., selective catalytic hydrocarbon conversion) by employing a solid crystalline zeolite (i. e., a molecular sieve) containing an added catalyst and having uniform interstitial (i. e., intra-crystalline) dimensions of sufficient size to allow the passage into or out of the pores of the zeolite of only certain molecules having a particular shape or size. The parties have termed these characteristics as "reactant selectivity" and "product selectivity." That is, the molecular sieve produces selectivity by a molecular filter action which prevents some feed molecules from coming into contact with the added catalyst (reactant selectivity) and/or prevents some products produced by the added catalyst from leaving the internal pore structure (product selectivity).

The parties have dealt with the issues relative to counts 6–8 as separate from the issues relative to counts 9 and 10, and we shall do likewise. We reproduce counts 6 and 9 as illustrative of the respective sets of counts:

6. A process for selectively conducting an organic chemical reaction which comprises carrying out a reaction involving contact of at least two molecular species of differing shape with a crystalline aluminosilicate zeolite molecular sieve material, bearing within the interior thereof an added catalyst, introduced into the zeolite subsequent to formation thereof, and active in effecting conversion of at least one of said species contained within the pores of said zeolite, which zeolite has uniform interstitial dimen-

sions sufficiently large to afford the release from said pores of the product of said conversion but sufficiently small to exclude from said product molecular species of larger size, effecting catalytic conversion of at least one of said species contained within the pores of said zeolite to a material chemically distinct therefrom and of a molecular shape capable of passing from the interior of said zeolite and simultaneously withdrawing, the product so obtained from the resultant effluent stream.

9. A process for selectively conducting an organic chemical reaction which comprises passing a charge capable of conversion into products of different molecular sizes over a crystalline aluminosilicate zeolite molecular sieve material having uniform interstitial dimensions sufficiently large to release conversion products of lesser molecular weight but sufficiently small to prevent release of larger products of conversion and bearing within the interior thereof an added catalyst, active in promoting said reaction, introduced into the zeolite subsequent to formation thereof, effecting catalytic conversion of the charge material admitted to contact with said catalyst within the interior of said zeolite to convert the same to at least one chemical species distinct from said charge and of a molecular size capable of passing from the interior of said zeolite and simultaneously withdrawing, said chemical species from the effluent stream passed over said zeolite.

I. *Frilette's Asserted Reduction to Practice of Subject Matter Within Counts 6–8*

█ The board awarded priority to Frilette as to counts 6–8 on the basis of certain laboratory work performed in January, February, and March of 1958 by Golden and Esgro. This work, designated as the "DC runs," employed a molecular sieve material known as Linde 5A, which is manufactured by the Linde

Division of the Union Carbide Corporation. This material was produced by replacing sodium ions in a Linde 4A molecular sieve with calcium ions, thereby effecting an increase in the uniform pore diameter from about four angstroms to about five angstroms.

Parker attacks Frilette's proof of actual reduction to practice for the following reasons: (a) at the time of the runs, the Linde 5A sieves were not known to contain an added catalyst; (b) there is no competent evidence with respect to the catalyst used; (c) proof of the feed stock used is inadequate; (d) appellee's failure to produce original data sheets abridged appellant's right of cross-examination; (e) testimony concerning the runs is inconsistent; (f) there was no conviction of success relative to the runs; (g) certain corroborating evidence is hearsay; and (h) the work was limited to the intrinsic activity of zeolites, not activity induced by an added catalyst.

Despite similar arguments before the board, priority was awarded to Frilette on the ground that the work of Golden and Esgro shows reduction to practice of counts 6–8. After a thorough review of the record and the briefs and arguments of counsel, we find no reversible error in the decision of the board. We will not discuss in detail each point raised by appellant; rather, we think it sufficient to quote from the board's decision, with which we agree:

> * * * We are satisfied that the zeolitic material listed as 5A by Golden in his laboratory record responds to the counts. We find no better identification of the zeolitic material employed by Parker in the Parker record.

> * * * We are also satisfied that the charge stocks used by Golden were properly identified. Golden testified concerning his use of "120–160 Mid Cont Cut (98 O.N.)" * * *. As to the work of Esgro with Golden, we regard Esgro as another pair of hands for Golden. Golden supplied him with

the charge stocks and catalysts. Esgro carried out the work and reported back to Golden, who kept the records. Prater * * * testified that Esgro was a competent laboratory assistant, Weisz * * *, that he was a reliable employee. Both testified that he carried out a supervisor's instructions to the minute detail.

> * * * We are satisfied that the analytical results of Golden Exhibits 3–27 are adequately proven by the testimony of Montgomery who was group leader of the low molecular weight mass spectrometry. The rule of reason normally is followed in applying the hearsay rule. Hurwitz v. Poon, 53 CCPA 1502, 364 F.2d 878, 150 USPQ 676.

> * * * While Parker states that Frilette et al. had no conviction of success as to the work of Golden and Esgro, we feel that the presentation of the data of page 697553 of Golden Exhibit 1 to the Catalyst Group Meeting of April 22, 1958 * * * and the statement therein that:

>> The selective cracking of n-hexane is clearly seen.

> as well as the similar statement on page 697553 provide evidence of such conviction.

In addition to what the board said, we think it necessary to add some comments relative to what appears to be appellant's main contention—that the Linde 5A zeolites used in the runs were not "known" or "shown" to contain an "added catalyst" which was effective as such. Appellant contends that the runs really showed only *intrinsic* catalytic activity of the 5A material and seems to take the view that the tests could constitute a reduction to practice only if it was known that the calcium in the 5A zeolites performed as a catalyst *extrinsic* to the zeolite and the results of the runs demonstrated that the calcium acted effectively as such an extrinsic catalyst.

█ The trouble with that contention is that appellant's own application, on which he must rely for support of the

counts, does not establish any recognition of the intrinsic-extrinsic theory. He is in no position, therefore, to impose such a restriction on Frilette's proofs. See Blicke v. Treves, 241 F.2d 718, 44 CCPA 753 (1957).

The counts in issue are broad enough to cover use of Linde 5A zeolite catalysts formed by exchange of sodium ions with a metal, such as calcium, wherein the exchanged ion acts as an added catalyst effecting conversion as defined. The reference to added catalysts is unambiguous, and it is clear that the DC runs involved the use of such a catalyst. It seems to be conceded that it is now known that the calcium ions in the Linde 5A zeolite in fact function as an added catalyst resulting in the selective catalytic conversion claimed. Since Frilette achieved selective catalytic conversion, and recognized the fact that selectivity was achieved, using a molecular sieve which is encompassed by the unambiguous counts in issue, the proof of reduction to practice is sufficient. There is no need for Frilette to prove contemporaneous recognition of the fact that selectivity was achieved through the mechanism of the calcium acting as an added catalyst inducing activity extrinsic of the zeolite since Parker also failed to recognize that fact. An inventor need not understand precisely why his invention works in order to achieve an actual reduction to practice.

## II. *Frilette's Asserted Reduction to Practice of Subject Matter Within Counts 9 and 10*

The board awarded priority to Frilette as to counts 9 and 10 on the basis of "Experiment No. 59" performed by Mower, which employed a molecular sieve produced by treating a Linde 5A (calcium-containing) sieve with dilute ammonium nitrate, drying, and calcining to introduce catalytically active acidity to replace the calcium. Experiment 59 was carried out by Mower on November 19, 1956 and involved passing n-hexane at a temperature of 875° F. over the ion-exchanged 5A molecular sieve. The product contained the following components in the specified mole percent: hydrogen—3%; ethylene—9.6%; ethane—13.8%; propene—29.4%; propane—25.5%; isobutane—2.7%; butenes—9.-7%; n-butane—1.8%; isopentane—3.-6%; other—0.9%.

Parker also attacks Frilette's proof of reduction to practice as to these counts for a number of reasons. It is his position that (a) the results do not show sufficient selectivity to count as a reduction to practice, (b) the results should have been compared with a thermal control run, (c) there was no contemporaneous conviction of success relative to the experiment, (d) the proof of the sieve used is insufficient, and (e) there is no proof that the ion-exchange and calcination did not destroy the crystallinity of the molecular sieve.

Again we must express our agreement with the board that:

\* \* \* the evidence \* \* \* shows reduction to practice for Frilette et al. of the invention of counts 9 and 10 by January 8, 1957. The evidence in the record for Frilette et al. shows selectivity. While Parker compares Experiment 59 performed by Mower with Example 8 of the Frilette et al. patent, we think it would be unrealistic to require complete elimination of the iso hydrocarbons in order to consider Experiment 59 as a reduction to practice. O. Clark Exhibit 9 shows that iso hydrocarbons obtained were decreased over what was obtained with a conventional catalyst.

\* \* \* We think that the source of the 5A pellets used by Mower \* \* \* has been sufficiently proved. Since this material was a staple, we see no necessity for establishing its crystallinity, uniform interstitial dimensions and other characteristics as urged by Parker. Nor has it been adequately shown by Parker that the conditions to which it was subjected in the Frilette et al. experiments would destroy these characteristics.

\* \* \* We find in the Frilette et al. record that Frilette did have a conviction of success from the hexane cracking by Mower. Frilette's statements in regard to further exploration or further pursuit of details of information do not negate this work as reduction to practice. Rimbach v. Wanmaker, 53 CCPA 1552, 362 F.2d 561, 150 USPQ 302. The fact that Frilette presented the data of Mower Exhibit 3 to the Catalyst Research Group shows his support of the results obtained. Thus, page MF–p–1 states:

The activated preparation was found to have considerable cracking activity for $C_6$ normal hydrocarbons, . . .

\* \* \* As to Parker's complaint that he was not permitted to cross-examine Frilette and Mower as to parts of their notebooks not introduced into evidence \* \* \*, we agree with Frilette et al. that this was beyond the scope of the direct examination.

It appears that Parker is particularly disturbed by the board's comparison of the results of Experiment 59 with a conventional catalyst in order to show that selectivity was achieved, and its refusal to compare the results with example 8 of the Frilette patent, said example showing selectivity to the extent that no iso-hydrocarbons whatsoever were produced. While there is no doubt that example 8 shows the ideal in regard to selectivity, this does not mean that the results of Experiment 59, wherein 6.3 mole percent of iso-hydrocarbons was found, do not also show selectivity. The testimony indicates that both Drs. Frilette and Weisz were convinced, despite the presence of some production of iso-hydrocarbons, that selectivity had indeed been achieved.

We also think it necessary, because of the position taken by the dissent, to briefly discuss a point which otherwise we would not, the board having adequately dealt with the issue. Appellant contends that the claimed crystallinity and uniformity of interstitial dimensions can be destroyed at a pH below 4 and/or a temperature above 1000° F., and that these characteristics might have been destroyed in Experiment No. 59. Both Parker and the dissenters would place the burden on Frilette to show that there has been no loss of crystallinity and uniform interstitial dimensions.

While a party must show reduction to practice of each and every limitation of the counts, we think Frilette has done so here. Frilette's starting zeolite material in Experiment No. 59 had the requisite characteristics, and it is his position that these properties were not changed during the ion-exchange process. Since appellant has presented no good reason to expect that there had been a change in character, Frilette has met his burden. Appellant is the one arguing that a change might have occurred, and the burden is on him to show reasonable grounds for his belief. The mere raising of the issue does not place a burden on Frilette to show that, in fact, the crystallinity and interstitial dimension were not destroyed. Frilette would have that burden only if Parker has shown good reason to believe the alleged change had taken place. See, Brinker v. Kray, Cust. & Pat.App., 460 F.2d 1073, decided June 1, 1972. The board found Parker has not done so here, and we must agree. There is no indication whatsoever that the experiment in question was performed at a pH below 4 or at a temperature above 1000° F.

III. *Parker's Asserted Reduction to Practice of Subject Matter Within Counts 6–10*

Parker's record in this interference is essentially identical to his record in a previous interference, No. 93,040, between the same parties. The sole count of that interference was as follows:

A process for selectively cracking normal paraffins to olefins which paraffins are contained in a hydrocarbon oil which comprises contacting the oil at a cracking temperature in the

range of from 800 to 1100° F. with a crystalline metallic alumino-silicate having a uniform pore size of about 5A° in a contacting zone and withdrawing from said zone an oil having a reduced normal paraffin content and an increased olefin content.

Both parties attempted to prove actual reduction to practice of subject matter within the count, but the board found both parties' proofs wanting and awarded priority to Parker on the basis of his filing date. Frilette did not appeal. There, as here, Parker relied on a certain "Run # 255," and the board's discussion thereof was as follows:

Frilette attacks Parker's contention that this testimony proves reduction to practice by pointing out that the only evidence as to the feed material used in run 255 is the secondary evidence contained in Parker Exhibit 18 and Arey Exhibit 4; that the original sources have not been established or authenticated except possibly with respect to the products of the run; and that there is no testimony as to how the data of Exhibit 18 were derived.

We agree with Frilette's position that this testimony on Parker's behalf is inadequate to prove that he reduced the invention to practice in this experimental work and ensuing analysis. Parker has presented a lengthy and comprehensive record as to the persons involved in this work and the procedures employed, but we find this record to be significantly lacking in proof of the aspect most particularly necessary to support his contention that the invention was reduced to practice. The conclusion was drawn on page 8 of Parker Exhibit 18 (dated March 5, 1957) that there was an "indication that 5A sieve appears to crack the normal hexane to a greater extent than the $C_6$ isoparaffins and naphthenes," but we find in this entire record no basis on which this Board can adopt that conclusion as its own. Parker himself did not testify, and no witness on his behalf testified as to how the conclusion could be reached

on the basis of the large mass of data and many miscellaneous bits of information presented. Parker has not provided such interpretation in his brief although challenged by Frilette to do so. While the documentary evidence submitted might lead to a surmise that this conclusion was correct, no witness was produced to provide the necessary connectives or support for the documentation, or to submit himself to essential cross examination. We hold accordingly that Parker has not proved his contention as to reduction to practice.

In the present interference, the board panel (consisting of one of the same members and two members who had not been on the former panel) again examined Parker's record with respect to Run # 255, saying

3. Melton testified relative to Run # 255, a cracking experiment conducted by him on December 28, 1956 and recorded by him in Exhibits 2B, 2C and 2D. Melton stated that the Feed stock (identified as # 914 on Exhibit 2B) was "supplied to us by the technical people;" the catalyst was "5A Sieve," which information was supplied by Parker, "the technical man on the unit" (P. 36) and that the gas and liquid products of the run were sent for analysis.

\* \* \* \* \* \*

7. Melun, the head of the business group at the Esso laboratory, gave the only testimony as to Parker Exhibit 18, Technical Committee Report on Studies on Light Naphtha Improvement, dated March 5, 1957. Melun's relation to this report was that this report was a formal progress report contained in the files under his supervision (P. 273, 274). The party Parker in his brief relies on Tables A–II and A–III of this exhibit, said on the exhibit to show "Thermal and Catalytic Cracking of Aramco $C_6$ Naphtha Liquid Product Distribution" (Table A–III). The inventor Parker did not testify as to this exhibit nor did any of the scientific personnel at Esso.

8. There is no analysis in the Parker record of the feed employed in Run 255 except for figures given in Table A–III of Parker Exhibit 18.

The board then discussed three arguments made by Parker to distinguish the present interference from the former, No. 93,040, but concluded that the same issue was present (namely, the composition of the feed stock in Run # 255) and that Parker still had not proved an actual reduction to practice. Frilette points out in his brief:

> The decision in Interference No. 93,040 cited deficiencies in the Parker record and if these deficiencies could have been overcome by producing additional evidence in this interference instead of relying on the identical record as that in Interference No. 93,040, it would seem apparent that Parker would have taken further testimony for this purpose.

On this appeal, Parker relies on a comparison between his Exhibit 12, which was properly authenticated and corroborated, and his Exhibit 18, which was not, to establish the composition of the feed stock for Run #255 set forth in Exhibit 18, that being the critical question. He notes that the composition of the *product* of Run # 255 as set forth in his Exhibit 18, as to seven separate ingredients, *agrees precisely* with the composition of the product of Run # 255 as set forth in his Exhibit 12, and he argues that this establishes the accuracy of the composition of the *feed* stock "No. 914" for Run #255, also set forth in his Exhibit 18 but not set forth in his Exhibit 12. He says:

> It is inconceivable that the identical *product* analysis involving some seven components could be produced from a feed other than that shown in Parker Exhibit 18 or *in a run other than Run 255.* [Emphasis ours.]

Parker also cites Hurwitz v. Shiu Yim Poon, 364 F.2d 878, 53 CCPA 1502 (1966), for the proposition that "the rule of reason should be followed in applying the hearsay rule" in interferences and argues that Parker Exhibit 18 should be accepted as adequate proof of the composition of the feed stock for Run # 255 because it was "a formal printed technical report of the Esso Research and Engineering Company [prepared *ante litem motam*] for purposes of wide circulation within that company."

■ As the board observed in its opinion in the previous interference, "a common sense view must be taken of questions of this nature and not a hypertechnical one." However, such a "common sense view" does not relieve a party to an interference who is attempting to prove an actual reduction to practice prior to his filing date of his burden of proving that reduction to practice as to *all* count limitations. Parker Exhibit 12, though authenticated and corroborated, proves nothing at all with respect to the *feed stock* of Run # 255; it is relevant only to the *product* of that run, and we cannot see how the correlation between the composition of the product as set forth in Parker Exhibits 12 and 18 proves the accuracy of the composition of the feed stock set forth in Parker Exhibit 18 only. It is true there is perfect correlation between Exhibits 12 and 18 as to the product, which would seem to show, as appellant argues, that both documents must relate to the same run so as to enable the analysis of the feed in Exhibit 18 to be read into Exhibit 12. The trouble with this argument is that Exhibit 18 is itself insufficiently authenticated as to the composition of the feed set forth in Tables A–I and A–III thereof.

We think Parker is trying to read more into Hurwitz v. Shiu Yim Poon, supra, than was intended. The trouble with Parker's evidence with respect to his Exhibit 18 is that Frilette had no way to go behind the bald figures therein. The exhibit was identified only by the custodian thereof, a person unqualified to testify concerning the contents of the report. As both panels of the Board of Patent Interferences which reviewed this evidence remarked, neither the inventor Parker nor any other of Esso's

scientific personnel testified concerning this exhibit, nor has Parker explained the absence of such testimony in any way. This is thus a case utterly unlike Anderson v. Pieper, 442 F.2d 982, 58 CCPA 1221 (1971), in which the "rule of reason" was relied on to relieve the appellants of the necessity of offering further corroboration of the notebook entries of a deceased colleague of the inventors.

■ For the foregoing reasons, we see no error in the board's determination that Parker failed to prove actual reduction to practice prior to his filing date of subject matter within counts 6–10.

Accordingly, the decision of the board is *affirmed.*

Affirmed.

RICH, Acting Chief Judge, dissenting, with whom ROSENSTEIN, Judge, joins.

I agree with the conclusion reached in part III of the majority opinion, but I disagree with the conclusions reached in parts I and II. I would, therefore, remand this case to the Board of Patent Interferences to permit consideration of Frilette's proof concerning activities asserted to constitute reductions to practice of subject matter within the counts prior to Parker's filing date but subsequent to the dates which the majority accords them.

## I. *Frilette's Asserted Reduction to Practice of Subject Matter Within Counts 6–8*

The question here, to my way of thinking, is not whether the calcium ions in the Linde 5A zeolites are "added catalysts" in some abstract, universal sense, but whether they are "added catalysts" *within the meaning of the counts as applied to Frilette.* In other words, the question is whether *Frilette* (not Parker) can rely on work employing Linde 5A zeolites as an actual reduction to practice of subject matter within counts 6–8. I think the majority permits Frilette to rely for reduction to practice upon work which, under well settled principles of law, would not be held to be within the scope of these counts if Frilette were to attempt to assert them as claims in an infringement action. I think that this is an anomaly which we should not permit.

The phrase "an added catalyst" is deceptively simple. On first reading, it seems that the counts read unambiguously on the use of calcium-containing zeolites. However, not all ambiguities are apparent on first readings, or even when reference is made only to the count or claim, as the case may be. McCutchen v. Oliver, 367 F.2d 609, 611, 54 CCPA 756, 759 (1966). As we said last year in In re Cohn, 438 F.2d 989, 993, 58 CCPA 996, 1001 (1971), "No claim may be read apart from and independent of the supporting disclosure on which it is based." See also, among many other examples, Ellipse Corp. v. Ford Motor, 452 F.2d 163, 167 (7th Cir. 1971), cert. den., 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972); Autogiro Co. v. United States, 384 F.2d 391, 397, 181 Ct.Cl. 55 (1967); Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) (so for the file wrapper and contents, from which this principle follows a fortiori); and Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 510, 37 S. Ct. 416, 61 L.Ed. 871 (1917). The principle is as vital as last week's advance sheets: Cleeton v. Hewlett-Packard Co., 343 F.Supp. 1215, 1228 (D.Md.1972) ("The claims of a patent should always be interpreted in the light of the specifications."). The majority ignores this principle on the ground that the counts are, in their view, unambiguous. But what did *Frilette* mean by the phrase "an added catalyst"? To answer this question, we must, I think, turn to the Frilette specification, which says:

> Molecular sieve[s] of the "A" series are ordinarily prepared initially in the sodium form of the crystal. The sodium ions in such form may, as desired, be exchanged for other cations.
> * * *

\* \* \* \* \* \*
\* \* \* These replacing ions include other monovalent or divalent cations such as lithium and magnesium, metal ions of the first group of the Periodic Table such as potassium and silver, metal ions of the second group such as *calcium,* and strontium, metal ions such as nickel, cobalt, iron, zinc, mercury, cadmium, gold, scandium, titanium, vanadium, chromium, manganese, tungsten, yttrium, zirconium, niobium, molybdenum, halfnium, [sic], tantalum, and other ions such as ammonium which, with the sodium zeolite of the "A" series, react as metal in that they replace sodium ions without occasioning any appreciable change in the fundamental structure of the crystalline zeolite. \* \* \* [Emphasis ours.]

Sodium zeolite of the "A" series exchanged with calcium or magnesium possesses larger pores than the unexchanged material.

Obviously, Frilette contemplated replacement of the sodium ions in the zeolite, as originally prepared, with calcium ions in order to vary the size of the pores. However, the specification does not indicate that Frilette was aware, even as late as the filing of the Frilette application, that the calcium ions also functioned as an added catalyst. This is apparent from the following language, with which the specification introduces the subject of added catalysts:

An important feature of the method of this invention is the provision of suitable catalytic activity within the intracrystalline structure in conjunction with the catalytic reaction system desired. This may be accomplished by various methods:

Catalytically active materials may be introduced into the crystal lattice by suitably contacting the zeolitic solids with solutions containing catalytically active components such as zinc, cobalt, nickel, silver, and others. In this manner, a catalytically active element can be introduced by deposition of the incoming metal on the zeolitic

solid after drying the solution from the crystalline carrier. Often, establishment of catalytic centers can be effectively achieved by exchanging a portion of the metal (Me in the general formula noted hereinabove) ion of the zeolite with an ion exhibiting catalytic activity for the desired conversion. *Thus, for example, a portion of the sodium or calcium ions normally contained in the molecular sieve structure may be zeolitically replaced with a number of various other ions* such as silver, copper, aluminum, hydrogen, zinc, strontium, cobalt, gold, potassium, nickel, ammonium, cadmium, mercury, lithium, and magnesium. Replacement is suitably accomplished by contacting the molecular sieve with a solution of an ionizable compound of the ion which is to be zeolitically introduced into the molecular sieve structure of a sufficient time to bring about the extent of desired introduction of such ion. After such treatment, the molecular sieve is waterwashed and calcined and thereafter is ready for use.

As the internal catalytically active species it may, [sic] be desired[,] in certain cases, to use an intrinsic catalytic activity possessed by the zeolite itself. In a copending application Serial No. 763,433 filed September 26, 1958, there are described some types of chemical activities which have been discovered to be possessed by some of the zeolite materials. Accordingly, by the use of this invention we can effect size selective catalytic reactions by the proper choice of the type and geometric crystal lattice dimensions of the zeolite, in combination with certain processing conditions. [Emphasis ours.]

Moreover, in describing an exemplary reactant-selective catalytic conversion process which employed a Linde 5A, calcium-containing zeolite, Frilette stated that:

In this example, use has been made of the *intrinsic catalytic activity* for

hydrocarbon cracking *of the zeolite itself*. [Emphasis ours.]

The majority places considerable reliance on the proposition that "An inventor need not understand precisely why his invention works in order to achieve an actual reduction to practice." Stated in the abstract, I agree with the proposition. However, the facts in this case are that zeolitic material may be effective in promoting selective organic chemical reactions either with or without the presence therein of an added catalyst, and Frilette's specification clearly classes the calcium-containing zeolite in the without-added-catalyst group, not in the with-added-catalyst category.

Moreover, while a party to an interference need not have understood *why* his invention worked, either at the time relied on for an actual reduction to practice or later, Frilette has not shown that they recognized at any time prior to Parker's filing date that the presence of calcium in the molecular sieve had any catalytic effect, added or otherwise. For that reason, too, Frilette's evidence with respect to Linde 5A sieves is inadequate to establish an actual reduction to practice. Heard v. Burton, 333 F.2d 239, 51 CCPA 1502 (1964); and Clauss v. Foulke, 379 F.2d 586, 54 CCPA 1514 (1967). See also MacMillan v. Moffett, 432 F.2d 1237, 58 CCPA 792 (1970).

In the light of Frilette's disclosure, I am persuaded that, even if calcium is *in fact* a catalyst which may be substituted for the sodium in crystalline, aluminosilicate zeolites subsequent to the formation thereof, *Frilette* may not rely on the use thereof as an actual reduction to practice of subject matter of counts 6–8. Whether or not Parker could do so is not a question before us. It has long been recognized that under certain circumstances the same claim may be interpreted differently in different specifications. Blackmore v. Hall, 1905 C.D. 561, 563. For present purposes, I think we should interpret counts 6–8 as if they were claims appearing in Frilette's patent. So doing, I would find that they do not read on the use of a calcium-containing

zeolite, and I would therefore hold that the use on Frilette's behalf of such a zeolite cannot be regarded as the reduction to practice of subject matter falling within the counts.

## II. *Frilette's Asserted Reduction to Practice of Subject Matter Within Counts 9 and 10*

The ground of my disagreement with the majority as to this aspect of the case can be stated much more briefly: burden of proof. As the majority states, I would place the burden on Frilette to show that the process by which they produced what they assert to have been a molecular sieve, used in the experiment on which they rely for a reduction to practice of subject matter within counts 9 and 10, did not destroy the crystallinity and uniform interstitial dimensions of the starting material. Frilette has offered absolutely no proof of this crucial fact, and what the majority is really doing is taking judicial notice that the process to which Mower subjected the Linde 5A molecular sieve could not have destroyed its crystallinity and uniform interstitial dimensions. There are, I think, only two theories on which the court would be justified in doing so. The first would be that it was in fact "so certainly known as to make it indisputable among reasonable men." This theory is discussed in § 324, "Matters of Common Knowledge: Jury Knowledge," in McCormick, Handbook of the Law of Evidence (1954). The second would be that it is a fact capable of certain verification, a theory which is discussed in the next succeeding section of McCormick's treatise. I do not believe that it can seriously be argued that the present situation qualifies for the first category, and I do not believe that Frilette has laid the proper foundation for us to hold that it qualifies for the second.

The board held that "it [has not] been adequately shown by Parker that the conditions to which * * * [the Linde 5A sieve] was subjected in the Frilette et al. experiments would destroy

these characteristics." I believe that the board put the shoe on the wrong foot. Frilette relied on Experiment No. 59 as an actual reduction to practice of subject matter within the counts, and Frilette therefore had the burden of proving that it responded to all the limitations of the counts. While Parker's case for the proposition that the crystallinity and uniformity of interstitial dimensions *were* destroyed during the preparation of the zeolitic material used in Experiment No. 59 is not overwhelming, it certainly is sufficient to place the question squarely in issue. I think, that this is all that could be expected of Parker, for, as pointed out in his brief, the board's allocation of the burden of proof in this respect "places an impossible task upon Parker since Frilette et al. did not produce any sample or analysis of the 5A material allegedly used in Experiment No. 59." In this respect, the situation here is very similar to the situation with respect to Parker's Exhibit 18. Concerning it, the majority says (and I agree), "The trouble with Parker's evidence with respect to his Exhibit 18 is that Frilette had no way to go behind the bald figures therein." I think the majority should apply the same principle to Frilette's Experiment No. 59.

59 CCPA
**In the Matter of the Application of William G. JAMES and Sherwin P. Malchick.**

**Patent Appeal No. 8748.**

United States Court of Customs and Patent Appeals.

July 13, 1972.

Richard L. Johnston, Chicago, Ill., John S. Roberts, Arlington, Va., John G. Premo, Chicago, attorneys of record, for appellants.

S. Wm. Cochran, Washington, D. C., for Commissioner of Patents. Fred W. Sherling, Washington, D. C., of counsel.

Before RICH, Acting C. J., ALMOND, BALDWIN and LANE, Judges, and CLARK, Justice (Ret.), United States Supreme Court, sitting by designation.